UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division



FILED

DEC - 8 2014

CLERK, US DISTRICT COURT
NORFOLK, VA

PRISON LEGAL NEWS, a project of the
HUMAN RIGHTS DEFENSE CENTER,

        Plaintiff,

v.

                                        Civil No. 2:13cv424

KEN STOLLE, Sheriff for Virginia
Beach, Virginia, et. al,

        Defendants.

## OPINION AND ORDER

    This matter is before the Court on a motion for partial summary judgment filed by Prison Legal News, a project of the Human Rights Defense Center, ("Plaintiff," or "PLN"), and a cross-motion for summary judgment filed collectively by Ken Stolle, Sheriff for Virginia Beach, Virginia ("Sheriff Stolle," or "the Sheriff"), and the eight named defendant employees of the Virginia Beach Sheriff's Office (collectively with the Sheriff, "Defendants"). For the reasons set forth below, the Court **TAKES UNDER ADVISEMENT** the parties' cross motions for summary judgment as to the constitutionality of Defendants' "sexually explicit materials" policy in order to permit additional briefing on such subject. As to the cross motions

for summary judgment on Defendants' "ordering form policy," Defendants' motion is **GRANTED** and Plaintiff's motion is **DENIED**. Additionally, the Court **GRANTS** Defendants' motion to the extent Defendants invoke the doctrine of qualified immunity. All other arguments in support of summary judgment contained in the cross motions are **DENIED**.

## I. Factual and Procedural Background

PLN is the publisher of a monthly magazine titled "*Prison Legal News*," which includes articles and news about various legal issues, access to courts, prison conditions, mail censorship, prisoner litigation, visitation rights, religious freedom, and prison rape, among other things. ECF No. 36, at 1. Contained in the monthly *Prison Legal News* magazine are advertisements from various vendors selling adult oriented photographs, which are frequently offered in two versions: "Nude" and "Non-Nude: Bureau of Prisons Friendly." Some advertisements are text only, some include various sized pictures of women in tight clothing and/or miniskirts, and some include thumbnail images of women or men wearing skimpy bathing suits or lingerie or otherwise in a state of undress. None of the images in *Prison Legal News* display nudity, but some images do include women or men posed in overtly sexual positions with a star shaped censor (hereinafter, "censor star") strategically placed to avoid any technical nudity. Although the censor star

images avoid any technical "nudity," the use of the star is plainly designed to be suggestive by giving the impression that the woman or man in the photograph is revealing their genital area, or alternatively, that the woman is revealing her breasts.

In addition to the monthly *Prison Legal News* publication, PLN also publishes and distributes books and periodicals on issues related to the criminal justice and corrections systems. Id. From 2012 through the present, PLN advertised for many of these additional publications in each monthly issue of *Prison Legal News*. Additionally, PLN produces a stand-alone "informational packet" designed to familiarize prisoners with various PLN publications. It is undisputed that, during the time period relevant to the instant litigation, all informational packets, and all monthly issues of *Prison Legal News,* that were sent to inmates at Virginia Beach Correctional Center ("VBCC") included "ordering forms" with prices advertising PLN's various written publications.

Since April of 2012, neither the monthly *Prison Legal News* magazine nor PLN's informational packet have been permitted inside VBCC, which is operated by Sheriff Stolle and the Virginia Beach Sheriff's Office ("VBSO"). According to Defendants, they have censored issues of *Prison Legal News* "pursuant to VBSO policies as PLN's magazines have contained sexually explicit pictures, which may be intended to arouse

3

sexual desire, may be deemed offensive, and/or include scantily clothed persons." ECF No. 48, at 2-3. Defendants assert that a policy preventing sexually explicit materials from entering VBCC is necessary to advance jail security and protect the safety of both jail personnel and VBCC inmates.

Separately, Defendants assert that *Prison Legal News* is not permitted at VBCC because it contains "ordering forms," which are not permitted at VBCC. PLN's informational packets have likewise been excluded from VBCC because they contain ordering forms. Defendants assert in their summary judgment filings that the prohibition on ordering forms "protects the public and businesses from fraud" because "VBCC inmates do not have cash, credit cards, or funds available to order or purchase from outside vendors." Id. at 7.

On July 30, 2013, PLN filed the instant civil action in this Court challenging the "censorship of its monthly publication, books and other correspondence," and further asserting a violation of due process based on Defendants' alleged failure to both timely notify PLN of such censorship and to provide PLN a meaningful opportunity to challenge such censorship. ECF No. 1, ¶ 1. On March 26, 2014, PLN filed an amended complaint, which continues to assert unlawful censorship and due process violations. ECF No. 17. Defendants, who are all represented by the same counsel, oppose the relief sought in

the amended complaint, and deny that they committed any constitutional violations. ECF Nos. 23, 28, 32.

In May of this year the parties attended a settlement conference conducted by a United States Magistrate Judge, but attempts at settlement were unsuccessful. PLN thereafter filed its motion for partial summary judgment. Defendants oppose Plaintiff's motion, and separately filed a cross motion seeking summary judgment as to all of Plaintiff's claims. Alternatively, Defendants seek a ruling that they are shielded by qualified immunity as to claims seeking monetary relief. The cross-motions for summary judgment are now fully briefed and ripe for review.[1]

## II. Standard of Review

The Federal Rules of Civil Procedure provide that a district court shall grant summary judgment in favor of a movant if such party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby Inc., 477 U.S. 242, 247-48 (1986). A

---

[1] The trial of this case has been continued at the request of the parties.

fact is "material" if it "might affect the outcome of the suit," and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248.

If a movant has properly advanced evidence supporting entry of summary judgment, the non-moving party may not rest upon the mere allegations of the pleadings, but instead must set forth specific facts in the form of exhibits, sworn statements, or other materials that illustrate a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986); Fed. R. Civ. P. 56(c). At that point, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. In doing so, the judge must construe the facts and all "justifiable inferences" in the light most favorable to the non-moving party, and the judge may not make credibility determinations. Id. at 255; T-Mobile Northeast LLC v. City Council of City of Newport News, Va., 674 F.3d 380, 385 (4th Cir. 2012).

When confronted with cross-motions for summary judgment, "the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks and citation omitted). As

6

to each separate motion, the Court must separately resolve factual disputes and competing rational inferences in favor of the non-movant.  Id.

### III. Discussion

#### A. Legal Standard Governing Restrictions on Incoming Mail/Publications at a Prison/Jail

It is well-established that "the First Amendment plays an important, albeit somewhat limited, role in the prison context." Montcalm Publ'g Corp. v. Beck, 80 F.3d 105, 107 (4th Cir. 1996). As described in detail in the Fourth Circuit's Montcalm opinion, the contours of the legal standard governing a jail's censorship of incoming and outgoing mail has changed over time.    Montcalm Publ'g, 80 F.3d at 107-08.    The standard now applicable to regulations that censor incoming publications was established by the United States Supreme Court in Turner v. Safley, 482 U.S. 78 (1987), and later expressly extended to incoming publications in Thornburgh v. Abbott, 490 U.S. 401, 413 (1989).

As explained by the Supreme Court in Turner, "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution"; however, the complexities of incarceration are such that "[r]unning a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive

branches of government." Turner, 482 U.S. 84-85. Accordingly, the Turner opinion "specifically rejected the application of [a] strict scrutiny" standard applicable to prison regulations that impinge on constitutional rights, adopting instead a four-part test "to guide the review process" that gives "deference to the judgments of prison administrators faced with difficult problems." Montcalm Publ'g, 80 F.3d at 108. Such test requires the Court to consider:

> (1) whether there is a "valid, rational connection" between the prison regulation or action and the interest asserted by the government, or whether this interest is "so remote as to render the policy arbitrary or irrational"; (2) whether "alternative means of exercising the right . . . remain open to prison inmates" . . . ; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether there exist any "obvious, easy alternatives" to the challenged regulation or action, which may suggest that it is "not reasonable, but is [instead] an exaggerated response to prison concerns."

Lovelace v. Lee, 472 F.3d 174, 200 (4th Cir. 2006) (quoting Turner, 482 U.S. 89-92) (first omission in original).

Further articulating the deference owed to prison administrators, the Fourth Circuit has repeated the Supreme Court's warning that "'courts are ill equipped to deal with the increasingly urgent problems of prison administration.'" Id. at 199 (quoting Procunier v. Martinez, 416 U.S. 396, 405 (1974), overruled by Thornburgh, 490 U.S. at 413-14). Accordingly, "courts must accord deference to the officials who run a prison,

overseeing and coordinating its many aspects, including security, discipline, and general administration." Id.; see In re Long Term Administrative Segregration of Inmates Designated as Five Percenters, 174 F.3d 464, 469 (4th Cir. 1999) (noting that "the evaluation of penological objectives is committed to the considered judgment of prison administrators, who are actually charged with and trained in the running of the particular institution under examination," and that "[w]hen a state correctional institution is involved, the deference of a federal court is even more appropriate") (internal quotation marks and citations omitted). Such deference is, in part, built into the Turner test as such test "is less restrictive than the test ordinarily applied to alleged infringements of fundamental constitutional rights." Lovelace, 472 F.3d at 200; see United States v. Stotts, 925 F.2d 83, 86 (4th Cir. 1991) (describing the role of courts in this context as "one of caution").

In applying the Turner test, it is the party challenging the prison regulation that "bears the burden of showing that the [challenged] regulations . . . are not reasonably related to legitimate penological objectives, or that they are an 'exaggerated response' to such concerns." Prison Legal News v. Livingston, 683 F.3d 201, 215 (5th Cir. 2012) (citing Overton v. Bazzetta, 539 U.S. 126, 132 (2003); Turner, 482 U.S. at 87). Although such burden falls squarely on PLN in the instant case,

Defendants are nevertheless required to articulate a rationale in support of the disputed polices such that the Court can perform a meaningful review of the policy under Turner. Beard v. Banks, 548 U.S. 521, 535 (2006) (plurality opinion); see Van den Bosch v. Raemisch, 658 F.3d 778, 786 (7th Cir. 2011) ("While the burden of persuasion is on the [plaintiff] to disprove the validity of a [prison] regulation, defendants must still articulate their legitimate governmental interest in the regulation.") (citations omitted); Livingston, 683 F.3d at 215 (noting that in order for prison administrators to be "entitled to summary judgment, . . . the record must be 'sufficient to demonstrate that the Policy is a reasonable one'" (quoting Beard, 548 U.S. at 533)).

## B. Parties' Summary Judgment Claims

PLN's motion for partial summary judgment and supporting memoranda challenge Defendants' polices banning from VBCC "sexually explicit" photos or publications, which at VBCC extends not only to what is traditionally considered "pornography," but also to "any writings [or] pictures . . . which may be deemed offensive" as well as to "material dealing with or displaying . . . scantily clothed persons." ECF No. 48-4. Separately, PLN challenges the VBSO policy banning incoming mail containing "ordering forms with prices." Id. Although PLN's amended complaint also alleges due process violations

based on Defendants' handling of censored PLN publications, PLN does not pursue such issue on summary judgment. ECF No. 36, at 11 n.8.

Defendants' summary judgment motion and supporting memoranda oppose Plaintiff's constitutional challenge to the two jail policies at issue, and assert that Defendants are entitled to summary judgment on such issues because the sexually explicit material and order form restrictions are constitutionally proper under Turner. Defendants also assert that they are entitled to summary judgment on Plaintiff's due process claim, arguing that PLN was afforded sufficient notice, and an opportunity to challenge, the rejection of its publications. Additionally, to the extent PLN's amended complaint seeks money damages, as contrasted with declaratory or injunctive relief, Defendants seek summary judgment on such monetary claims based on their qualified immunity. The Sheriff also asserts that summary judgment should be entered in his favor because Plaintiff's claims against him are improperly based on Respondeat Superior liability.

## C. Analysis

### 1. Challenge to Ordering Form Ban

Considering first the VBSO ban on incoming publications containing "ordering forms," Defendants' policy states: "Newspaper clippings, lyrics, poems, calendars, ordering forms

with prices, catalogs, brochures, any information printed from the internet, checks or cash will not be accepted." ECF No. 48-4, ¶ 6 (emphasis added); ECF No. 48-13 (banning "Mail containing" the above listed items). Defendants assert in their summary judgment filings that because inmates at VBCC have no access to money, the order form ban is designed to protect the public from fraud, further stating that there have in the past been investigations into VBCC inmates fraudulently using credit cards to purchase goods from outside vendors, as well as problems with inmates using stamps as currency to purchase items from outside vendors. ECF No. 48-3, ¶¶ 12, 16-17. PLN responds by arguing that the Sherriff failed to articulate "fraud" as a justification for such policy during his deposition, and separately arguing that the disputed policy is not a rational means of achieving such goal. Having considered each motion for summary judgment, resolving factual disputes and competing rational inferences in favor of the non-movant, Rossignol, 316 F.3d at 523, the Court **GRANTS** summary judgment in favor of Defendants on this issue.

### a. Fraud as the asserted Penological Goal

As noted above, Defendants' position is that the ban on incoming mail containing "ordering forms" is in place at VBCC to prevent inmates from committing fraud on the public, and PLN concedes that the prevention of fraud is in fact a valid

12

penological goal. ECF No. 52, at 8. Notwithstanding its concession, PLN highlights in its summary judgment filings that: (1) the Sheriff did not articulate the prevention of fraud as a basis for the ban on catalogs and ordering forms with prices during his January 2014 deposition; and (2) the Sheriff further stated during such deposition that he was "not sure" that there would be a benefit to denying inmates access to certain types of catalogs if such catalogs were intended to be used by the inmate to identify to loved ones which permissible items the inmate would like as a gift. ECF No. 36-3, at 16-18. Although the Sheriff did not mention "fraud" in the deposition excerpts that were provided to the Court, he did say that the reason the VBSO censors "ordering forms with prices, catalogs, brochures" is that inmates "have no way to pay" for such items and are not permitted to "purchase anything outside of the [VBCC] canteen." Id. Moreover, "fraud" was identified as the Defendants' penological motivation for the ban on ordering forms in discovery responses provided to Plaintiff two months prior to the Sheriff's deposition. ECF No. 48-6, at 8. Additionally, the Sheriff subsequently provided an affidavit more fully explaining his view on the risk of VBCC inmates committing fraud on the public if they have access to ordering forms. ECF No. 48-3. Accordingly, based on the current record, the Court finds both that "fraud" is a valid penological goal and that it is the

penological goal articulated by Defendants that must be analyzed by this Court in its analysis of the <u>Turner</u> factors.[2]

### b. Ordering Form Ban satisfies <u>Turner</u> test

This Court begins its analysis under <u>Turner</u> by reiterating the clear and controlling rule of law mandating that this Court afford deference to prison administrators in the difficult arena of managing a prison. <u>Lovelace</u>, 472 F.3d at 199; see <u>Stotts</u>, 925 F.2d at 86 (explaining that heightened scrutiny would result in unworkable intertwinement of the courts in difficult institutional judgments, and therefore, the proper approach for a reviewing court is "one of caution"). Separately, the Court reiterates that the burden is "not on [Defendants] to prove the

---

[2] Although prison authorities must articulate the goal or goals that a policy is aimed at achieving in order for a Court to apply the test articulated in <u>Turner</u>, the subjective viewpoint of any one administrator is not controlling because the better interpretation of <u>Turner</u> is that it is an <u>objective test</u> that turns on the reasonableness of the policy itself, not the personal viewpoint of any one actor. <u>See</u> <u>Hammer v. Ashcroft</u>, 570 F.3d 798, 803 (7th Cir. 2009) (indicating that the <u>Turner</u> test involves "an objective inquiry"); <u>Lovelace</u>, 472 F.3d at 200 (rejecting an approach that focused "entirely on the defendants' state of mind" because such inquiry did not resolve the question of whether the prison's policy, "by its own terms" violates the Constitution). Arguably, any other approach would be unworkable because even if a policy was struck down by a Court due to evidence of improper subjective motivation, it could be readopted by the jail the very next day on the proffered objectively valid ground that would have otherwise satisfied the <u>Turner</u> test. Alternatively, consistent with the conclusion reached earlier this year by the United States Court of Appeals for the District of Columbia Circuit, even if this Court assumes that "motive" plays some part in the <u>Turner</u> inquiry and that "some quantum of evidence of an unlawful motive can invalidate a policy that would otherwise survive the <u>Turner</u> test," this Court finds that the record developed by PLN in this case "is too insubstantial to do so." <u>Hatim v. Obama</u>, 760 F.3d 54, 61 (D.C. Cir. 2014).

14

validity of prison regulations but on the [Plaintiff] to disprove it." Overton, 539 U.S. at 132.

### i. Rational Connection

The first step of the Turner analysis requires the Court to consider whether, based on the record before it, there is a "valid, rational connection" between the ordering form ban and the prevention of fraud on the public, or whether such penological goal is "so remote as to render the policy arbitrary or irrational." Lovelace, 472 F.3d at 200. Because the current record suggests two different interpretations of the disputed ordering from ban, the Court first articulates the difference in interpretations and then analyzes each alternative.

Although the disputed policy states, on its face, that it bans "ordering forms with prices," there is conflicting evidence in the record as to whether such policy, was/is applied at VBCC to exclude: (1) any incoming publication that includes an actual "order form" that can be filled out and returned to a vendor; or (2) any incoming publication that does not include a "per se order form," but does include a product advertisement with a price, as well as sufficient additional information to permit an individual to order such product from the advertising vendor. Compare ECF No. 36-5, at 6-8 (deposition testimony from VBSO employee Captain Lori Harris indicating that written publications are permitted at VBCC if they include

15

advertisements with prices as long as there is not a per se "order form" that can be mailed back to the vendor), with ECF No. 48-3, ¶ 10 (affidavit from the Sheriff stating that the policy "encompasses all solicitations, ordering forms, catalogs, brochures, whether print or from the internet, which offer inmates the opportunity to make purchases from outside vendors," and that "[o]ffers without ordering forms per se, but which contain information required to make such purchases, are included in this policy"). Although the precise contours of the disputed policy are unclear from the current record, as evidenced by the analysis that follows, such lack of clarity does not constitute a "genuine dispute as to a material fact" because the penological objective advanced by Defendants would be adequately served by either version of the policy, one version of the policy would simply appear to be more effective than the other at achieving such goal.[3]

## * Per Se Ordering Forms *

First, assuming the policy to ban only "per se" order forms that can be filled out and returned to a vendor, PLN does not dispute the fact that the banned issues of *Prison Legal News* and

---

[3] Although not squarely addressed in the briefs before the Court, to the extent the VBSO banned only "per se" ordering forms, logic would suggest that jail authorities could reasonably determine that VBSO resources would be unduly taxed by scouring the fine print in all incoming publications to determine if "ordering information" was included, as contrasted with conducting a more limited search for easily identifiable "order forms."

16

the banned PLN informational packets all included such "per se" order forms. ECF No. 38, ¶¶ 6, 8, 25. The question for the Court is therefore limited to whether the ban on "per se" ordering forms has a valid and rational connection to reducing fraud. A review of relevant case law reveals few instructive cases on prison policies aimed at combating fraud on the public, see, e.g., <u>Woods v. Commissioner of the Ind. Dept. of Corrections</u>, 652 F.3d 745 (7th Cir. 2011), and an apparent dearth of case law involving regulations designed to prevent prisoners from accessing vendor information in an effort to combat fraud.[4] However, regardless of whether there exist any factually similar policies at other jails or prisons aimed at similar penological concerns, the law is clear that PLN "bears the burden of showing that the [challenged] regulations . . . are not reasonably related to legitimate penological objectives." <u>Livingston</u>, 683 F.3d at 215.

PLN argues that excluding publications containing ordering forms from VBCC is not an effective means to achieve the goal of

---

[4] This Court is unaware of any federal case addressing a ban on "ordering forms" contained within other publications adopted for the purpose of combatting fraud, with the exception being a case barring magazine inserts that permit a prisoner to renew a magazine subscription <u>on the promise</u> of future payment. <u>See Klein v. Skolnik</u>, No. 3:08cv177, 2010 WL 745418, *3-4 (discussing the prison's policy of removing magazine renewal inserts prior to delivering magazines to inmates). Other courts have acknowledged the appropriateness of bans on catalogs and other unsolicited "junk mail" designed to alleviate the heavy burden on prison mail rooms. <u>See, e.g.</u>, <u>Morrison v. Hall</u>, 261 F.3d 896, 905 (9th Cir. 2001).

reducing fraud on the public. Specifically, PLN argues that VBCC inmates cannot commit mail order fraud because they do not have money (or stamps as a substitute to money), VBCC rules prohibit them from purchasing mail order items, and all incoming mail at VBCC is screened for contraband (presumably suggesting that most mail order items would never be delivered to VBCC if ordered). ECF No. 52, at 8. Such argument, however, "seems to be that the regulation in question is unnecessary" in PLN's opinion, rather than remote or arbitrary. Woods, 652 F.3d at 749. Although Defendants' ban on "ordering forms" might constitute only one of several policies aimed at deterring additional crimes and/or reducing fraud on the public, there is no constitutional or prudential requirement that a jail policy alone root out all evil for it be "reasonable" in its pursuit of a valid penological objective. To the contrary, controlling law clearly provides that a jail "does not need actually to demonstrate that its regulations" succeed in achieving the penological goals at which they are aimed; the regulations must instead merely have a rational relationship to the stated goals. Stotts, 925 F.2d at 87 (citations omitted); see Amatel v. Reno, 156 F.3d 192, 202-03 (D.C. Cir. 1998) (indicating that the question of whether a federal statute regulating incoming publications at a prison is constitutional under Turner does not require the court to ask if such rule "will advance the prisons'

rehabilitative project, but whether Congress could reasonably have believed that it would do so"). Accordingly, PLN's suggestion that the disputed policy is not rational or necessary because it arguably overlaps other VBSO rules carries little weight.

Although Plaintiff seeks to cast the VBSO policy as ineffective and suggests that the risk of fraud is very low, it offers no evidence to such points, and instead advances several arguments that seemingly attempt to shift the burden to Defendants. For example, Plaintiff argues that Defendants have not demonstrated an evidentiary link between past instances of inmate fraud and such inmates' access to order forms. Such arguments, however, miss the mark because Defendants have no obligation to prove that their policy is responsive to past misuse of order forms. It is well-documented in the law that a jail must adopt regulations in anticipation of future events, and the Turner "reasonableness" standard is designed to: (1) "ensure[] the ability of corrections officials to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration"; and (2) "avoid[] unnecessary intrusion of the judiciary into problems particularly ill suited to resolution by decree." O'Lone v. Estate of Shabazz, 482 U.S. 342, 349-50 (1987) (internal quotation marks and citations omitted). Moreover, although it

is arguably unclear what degree of evidentiary proof a defendant must advance in defense of a jail regulation, here, Defendants have advanced evidence demonstrating that fraud is a real, and not artificial, concern at VBCC through the introduction of an affidavit stating that there have been "multiple investigations of [VBCC] inmates involving the fraudulent use of credit cards to purchase goods from outside vendors or to generate profits from the use of credit/debit cards, and possible bank fraud and check writing schemes," with one such investigation leading to criminal convictions for credit card fraud.  ECF No. 48-3, ¶ 16. Defendants have also presented evidence demonstrating that VBCC inmates have previously purchased items from vendors outside the approved channels by using stamps as currency.[5]  Id. ¶ 17. Considering these facts together, Defendants have advanced a reasonable relationship between the "ordering form" ban and the goal of combatting fraud.

Associated with the above arguments, PLN asserts that the "ordering form" ban is arbitrary because inmates have access to television and newspapers.  First, as to television, the fact that prisoners may have fleeting access to a certain television advertisement for a product does not undercut the rationality of the VBSO ban on print materials containing ordering forms.

---

[5] Many of the "ordering forms" contained in issues of *Prison Legal News* expressly invite readers to pay for advertised products through postage stamps.

20

Unlike television, print materials can more readily be previewed by authorities in order to exclude materials that pose a risk. Moreover, unlike television, print ads are static and present a more long-term opportunity to facilitate fraud. As to PLN's suggestion that other print materials, such as newspapers, that contain "per se" order forms were admitted into VBCC during the relevant time period, such contention is speculative and not supported by the record as Plaintiff has not introduced a single newspaper edition or magazine issue that was admitted into VBCC during the relevant period that contained ordering forms.[6]

Accordingly, the Court finds that Defendants have articulated a valid rational connection between the ban on per se ordering forms and the penological goal of combating fraud and PLN has failed to undercut such connection. Notably, "[a]

---

[6] There appears to be some legal support for the proposition that inconsistent application of a prison policy may serve to undercut the claimed link between the policy and the asserted penological goal. See Couch v. Jabe, 737 F. Supp. 2d 561, 569 (W.D. Va. 2010) (noting that when a publication that plainly violates a prison regulation is nevertheless permitted, "the argument by [the defendants] that there is a logical connection between the broad scope of the regulation and their legitimate goals is fundamentally weakened"). However, PLN did not introduce as an exhibit any newspapers or other publications allegedly permitted into VBCC during the relevant period in an effort to demonstrate that Defendants were not applying the policy in a neutral fashion. Plaintiff did ask questions of one deposition witness about the "Virginia[n] Pilot" newspaper generally, and also asked questions about a specific issue of a sports magazine that appears to have belonged to a lawyer involved in this case, but PLN did not ultimately introduce those materials in support of, or opposition to, one of the pending summary judgment motions. ECF Nos. 36-5, 52-1. PLN has therefore failed to demonstrate that the manner in which the policy was applied could serve to undercut the logical connection between such policy and the stated goal of combatting fraud.

prohibition on [ordering forms] relates fairly directly to the goal of preventing fraud since it cuts off the inmates' access to potential victims." Woods, 652 F.3d at 749.

## * Ordering Information *

Assuming, arguendo, that the policy at issue bans not only advertisements with "per se" ordering forms, but also those ads which contain sufficient information required to purchase the advertised product, PLN likewise fails to demonstrate that such policy lacks a "valid rational connection" to reducing fraud. To the contrary, such a policy would likely be more effective at combatting fraud because it would restrict more incoming publications from VBCC, and thus would reduce the likelihood of fraud being committed by a more resourceful inmate who, in the absence of an "ordering form," is willing to draft a letter or use other means to perpetrate a fraudulent transaction.[7] Accordingly, the conflict in the record as to precisely how the VBSO's policy is applied is not material to the determination of whether the policy at issue is rationally connected to reducing

---

[7] To the extent that the record suggests that newspapers are allowed at VBCC, and common familiarity with newspapers reveals that they often contain ads selling products, if the VBSO's ban extends to all "ordering information," PLN might be in a better position to demonstrate, as PLN at least suggests through its current filings, that PLN's publications were subject to unequal treatment at VBCC. However, as stated in the preceding footnote, PLN has not introduced any newspapers or other magazines as exhibits in an effort to support its "suggestion" of differential treatment, and it is therefore impossible to determine without resorting to speculation whether PLN's publications were treated differently.

22

fraud—it is so connected under either interpretation of the ordering form policy.

The Court therefore reincorporates the above analysis and alternatively finds that, on the current record, Defendants have articulated a valid rational connection between a ban on "ordering information" and the penological goal of combating fraud.[8]

## ii. Alternative Means

The second Turner factor requires the Court to consider whether there are alternative methods for PLN, and VBCC inmates, to exercise their constitutional rights. Lovelace, 472 F.3d at 200. The constitutional right at issue in this case, defined expansively,[9] appears to include PLN's ability as a publisher to communicate with inmates at VBCC, and the inmates' intertwined

---

[8] Although the lack of clarity in the record is immaterial to ruling on this issue, it appears that Defendants have an obligation to provide inmates, the public, and VBSO staff with sufficient information such that the controlling policy is understood by all. The Court would hope that, to the extent Defendants intend on applying their policy to ban all "ordering information," regardless of whether there is an "ordering form with prices," they make the effort to modify their written policy. Additionally, whatever version of the policy is applied going forward, Defendants should anticipate the fact that they may find themselves back in this very Court if such policy is not applied consistently across different publications.

[9] The Supreme Court has cautioned against a narrow interpretation of "the right" in question, finding that it must be "viewed sensibly and expansively." Thornburgh, 490 U.S. at 417. Accordingly, prison mail restrictions that limit certain publications from entering the prison, yet still "permit a broad range of publications to be sent, received, and read" favor the constitutionality of the challenged restriction. Id. at 418.

right to receive written materials from PLN and other
publishers. The current record presents little question that
this factor cuts in Defendants' favor because VBCC inmates may
permissibly receive written materials mailed directly from PLN,
and other publishers, to include any books or other written
publications that do not include order forms and do not
otherwise violate VBCC policy. Specifically, the record reveals
that at least one book published by PLN is permitted at VBCC,
and PLN is not precluded by VBSO policy from otherwise
communicating with inmates. Inmates likewise have access to a
lending library and may receive newspapers and magazines from
PLN and other publishers that comply with VBSO policies.
Accordingly, the limits on PLN's ability to mail publications to
VBCC inmates that include "ordering information" advertising for
other mail order products does not eliminate PLN's ability to
communicate with VBCC inmates.[10]

---

[10] Although VBSO rules prohibit inmates from receiving ordering forms
with prices, as suggested by the Sheriff's deposition testimony, it
appears that PLN, as a publisher, may be permitted to mail a
publication to VBCC inmates that does not include pricing or other
"ordering information" but does include enough details about PLN's
educational publications such that the inmate could ask a friend or
family member to seek out PLN to discover the necessary ordering
information. Moreover, to the extent PLN wants to provide inmates
access to the articles in the monthly issues of *Prison Legal News*, PLN
appears to retain the ability to either publish and provide a free
version of *Prison Legal News* that does not include the banned
advertisements, or to publish a separate paid version of its monthly
publication (the subscription to be paid for by friends or family of a
VBCC inmate) that excludes the banned advertisements. Although such
alternatives may not be desirable to PLN or its business model, the

### iii. Impact of the desired accommodation

The third Turner factor requires the Court to consider the likely impact on VBSO staff, inmates, and prison resources if the challenged regulation is struck down. Most relevant to such inquiry in this case "is whether lifting the ban would re-open a channel of communication" that would create the reasonable potential for future frauds to occur. Woods, 652 F.3d at 750. Consistent with the prior discussion herein, this Court believes that striking down the ban on ordering forms would create such risk. As in Woods, here, there is record evidence that the Sheriff has utilized investigative resources to root out prior frauds at least similar to those targeted by the policy in dispute, and dedicating resources to investigate past crimes "is not the type of activity prison officials should regularly have to conduct"; rather, they should endeavor to implement policies to curtail such illegal behavior before it occurs. Id. Accordingly, because Defendants in this case were "rational in their belief that, if left unchecked, an activity will lead to fraud," restricting that activity "does not violate inmates' First Amendment rights." Id.

---

fact that such alternatives appear to exist, further support a finding in favor of Defendants on the second Turner factor.

## iv. Obvious Alternatives

The fourth Turner factor requires the Court to consider whether there are "any obvious, easy alternatives to the challenged regulation or action, which may suggest that it is not reasonable, but is [instead] an exaggerated response to prison concerns." Lovelace, 472 F.3d at 200. Stated differently, the Court considers whether an alternative regulation, or no regulation at all, "would fully accommodate the [Plaintiff's] First Amendment rights at a de minimus cost to legitimate penological interests." Woods, 652 F.3d at 750. PLN does not present any evidence that an alternative regulation would sufficiently achieve the same penological goals, but does argue that the regulation is unnecessary because other VBSO polices prevent fraud through limiting inmates abilities to purchase outside items. Even assuming that such other rules or practices help reduce the potential for fraud, they "can hardly be said to eradicate it." Id. PLN does not appear to consider the possibility that inmates could commit fraud through using false credit card information or forged checks. Similarly, PLN does not appear to consider the possibility that products not permitted at VBCC could be purchased through a mail order fraud scheme launched from within the jail walls with the products arranged to be shipped to a friend or family member outside the walls of VBCC. Accordingly, because "no single regulation can

serve as a catchall for eliminating the potential for fraud," based on the current record, the appropriate course is to "defer to the judgment of the prison administrators when it comes to deciding whether a ban on [ordering forms] is also necessary." Id.

Having considered all of the Turner factors, the Court finds that Defendants' ordering form policy survives scrutiny under such test, noting again that the burden was on PLN to demonstrate the unconstitutionality of the disputed policy, and on the current record, no reasonable factfinder could conclude that PLN carried such burden. The fact that PLN is purportedly widely permitted in jails and prisons across the country is not itself a reason to declare the more restrictive VBSO policies unconstitutional. Evidence advanced by a plaintiff is necessary to prove such fact, and such evidence is not currently before this Court. Defendants' summary judgment motion is therefore **GRANTED** on this issue.

### 2. Challenge to Sexually Explicit Materials Ban

Plaintiff's amended complaint seeks monetary damages, equitable relief, and declaratory judgment, associated with VBSO's rule prohibiting publications containing "sexually explicit material." PLN contends that such rule is vague and overbroad, and that it was unconstitutionally applied to PLN. ECF No. 17, at 9. The parties have filed cross motions for

summary judgment on this issue; however, in light of the above ruling on the ordering form ban, the Court takes this matter **UNDER ADVISEMENT** pending additional briefing.

It appears undisputed that every issue of *Prison Legal News* and every PLN "informational packet" that was excluded from VBCC during the relevant time period contained per se "ordering forms," and thus, PLN cannot establish that the exclusion of such publications from VBCC violated the Constitution. Because all excluded PLN materials were permissibly excluded for containing ordering forms, it appears that a question exists as to whether one or more of PLN's challenges to the VBSO's "sexually explicit" materials policy have been rendered moot. The parties should therefore provide supplemental briefing addressing the following two matters: (1) which of Plaintiff's claims, if any, remain a live controversy; and (2) to the extent any of PLN's claims survive or potentially survive the instant ruling, the parties should separately address the law governing each type of claim (facial challenge vs. as applied challenge), and should provide individualized supplemental arguments as to how the Court should rule on each type of surviving or potentially surviving claim.

### 3. Alleged Due Process Violations

In addition to the above issues on which cross-motions for summary judgment were filed, Defendants move for summary

judgment as to Plaintiff's claim that PLN was unconstitutionally denied due process when it was not timely notified of Defendants' rejection of PLN publications, or the actual reasons for such rejections, and was also not provided a meaningful opportunity to challenge such censorship decisions. For the reasons discussed below, Defendants' summary judgment motion is denied on this issue.

In Montcalm Publ'g, the Fourth Circuit expressly held that a magazine publisher "has a constitutional interest in communicating with its inmate-subscribers" and is therefore entitled to some degree of process when a publication is censored. Montcalm Publ'g, 80 F.3d at 109; see also Jacklovich v. Simmons, 392 F.3d 420, 433 (10th Cir. 2004) (agreeing with the holding in Montcalm Publ'g). Although the Fourth Circuit did not expressly define the precise contours of the process necessary to satisfy the Constitution, it "h[e]ld that publishers are entitled to notice and an opportunity to be heard when their publications are disapproved for receipt by inmate subscribers," and appeared to discuss with favor a procedure that would provide publishers a written rejection notice and an opportunity to respond in writing. Id. at 106, 109.

Here, it appears undisputed that Defendants first notified PLN of a rejection of an issue of *Prison Legal News* in April of 2012, and did not thereafter notify PLN of subsequent rejections

of any PLN publications until late 2013, after the instant lawsuit was filed.[11] Moreover, the record demonstrates that during a period of time in late 2013 when PLN was receiving notice from Defendants of censorship decisions and seeking a review of such decisions, the "review procedure" merely involved a VBSO employee reviewing whether the rejection form was properly filled out; it did not involve a review of the rejected publication to determine whether it actually violated VBSO rules. ECF No. 52-2, at 2-5; see Jordan v. Sosa, 577 F. Supp. 2d 1162, 1172-73 (D. Colo. 2008) (concluding that a BOP program statement was unconstitutional "to the extent it permits the institution to return the [rejected] publication . . . to the publisher prior to completion of the administrative review") (emphasis added).

During the time period relevant to this case, the VBSO has twice amended its policy associated with providing notice and an opportunity to be heard, the first amendment appearing to ensure that "notice" is properly provided, and the second appearing to

---

[11] Defendants' assertion that PLN received sufficient notice of the VBSO's ongoing censorship of each *Prison Legal News* monthly publication during 2012 and early 2013 because VBCC inmates made complaints to PLN does not appear to be supported by the law of this Circuit. See Montcalm Publ'g, 80 F.3d at 109 (noting that "while the inmate is free to notify the publisher and ask for help in challenging the prison authorities' decision, the publisher's First Amendment right must not depend on that"). Moreover, Defendants acknowledge that some issues of *Prison Legal News* were being delivered by a certain VBSO employee during the relevant time frame, further suggesting that PLN may not have known when issues were delivered, and when they were censored.

ensure that a publisher be given the opportunity to be heard as part of a meaningful review procedure.[12] Although it appears from the current record that the VBSO's procedures currently in force provide constitutionally adequate notice and a sufficient opportunity to participate in a meaningful review of a censorship decision, such recent changes in policy do not undercut PLN's ability to obtain injunctive relief as to the prior practices applied during the period relevant to this litigation and challenged in PLN's amended complaint.[13] See Wall v. Wade, 741 F.3d 492, 497 (4th Cir. 2014) (noting that the "heavy burden" of demonstrating that "the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness," and that the Fourth Circuit has "previously held that when a defendant retains the authority and capacity to repeat an alleged harm, a plaintiff's claims should not be dismissed as moot") (internal citations omitted). This is particularly the case because Defendants do not in any way acknowledge that their prior practices were unconstitutional, and instead portray their recent policy revisions as "clarifications." To the extent that Defendants maintain that their prior procedures were lawful, PLN's injunctive claim is

---

[12] Among the recent revisions in procedure, Defendants now retain a copy of the excluded publication until the review process is complete.

[13] It appears from the record that PLN also seeks nominal damages and punitive damages for the alleged past violations.

not moot, as claimed by Defendants, because there is no impediment to Defendants returning to their past practices.

Accordingly, because the current record, when viewed in PLN's favor, could plainly support a finding that Defendants failed to provide PLN with constitutionally adequate notice, a constitutionally adequate opportunity to be heard, or both, Defendants' summary judgment motion is **DENIED** as to this issue.

## IV. Immunity

Defendants move for summary judgment on Plaintiff's claims seeking money damages as to both the "ordering forms" policy and the "sexually explicit materials" policy on the basis of both Eleventh Amendment immunity and qualified immunity.  For the reasons discussed below, Defendants' summary judgment motion is **GRANTED** as to their assertion of qualified immunity.

### A. Eleventh Amendment Immunity

The Eleventh Amendment to the Constitution of the United States immunizes the individual states against suits seeking money damages.  U.S. Const. amend. XI; see Vollette v. Watson, 937 F. Supp. 2d 706, 713-16 (E.D. Va. 2013) (discussing the fact that Virginia Sheriffs are state constitutional officers and are therefore immune from suit under the Eleventh Amendment for "official capacity" claims seeking money damages, but are not immune from suit for claims seeking injunctive relief). However, here, in light of the parties' positions on summary

judgment, there is no dispute that Eleventh Amendment immunity is not applicable to the claims pending in this case. Notably, while Defendants effectively argue that they are shielded from liability by the Eleventh Amendment for claims seeking money damages against them in their "official capacity," ECF No. 48 at 29-30, PLN concedes in its responsive brief that Plaintiff's "official capacity" claims are limited to seeking injunctive relief, ECF No. 52, at 18-19. Accordingly, as PLN makes clear that it does not advance any "official capacity" money damages claims in this case, and the law clearly provides that Eleventh Amendment immunity does not extend to claims seeking injunctive relief, no further ruling is required by the Court on this issue. Bland v. Roberts, 730 F.3d 368, 390-91 (4th Cir. 2013).[14]

## B. Qualified Immunity

Defendants separately assert that the claims seeking money damages against Defendants in their "individual capacities" based on the "ordering form" ban and the "sexually explicit materials" ban are barred based on the doctrine of qualified immunity. As recently explained by the Fourth Circuit:

A government official who is sued in his individual capacity may invoke qualified immunity. See Ridpath [v. Board of Governors Marshall Univ.], 447 F.3d [292,] 306 [(4th Cir. 2006)]. "Qualified immunity protects government officials from civil damages in a

---

[14] Defendants' summary judgment motion would be granted on this issue to the extent that PLN did assert claims seeking money damages against Defendants in their "official capacities." Bland, 730 F.3d at 390-91.

33

§ 1983 action insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Edwards v. City of Goldsboro, 178 F.3d 231, 250 (4th Cir. 1999) (internal quotation marks omitted). In determining whether a defendant is entitled to qualified immunity, a court must decide (1) whether the defendant has violated a constitutional right of the plaintiff and (2) whether that right was clearly established at the time of the alleged misconduct. See Walker v. Prince George's Cnty., 575 F.3d 426, 429 (4th Cir. 2009). However, "judges of the district courts and the courts of appeals [are] permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson v. Callahan, 555 U.S. 223, 236 (2009).

In analyzing whether the defendant has violated a constitutional right of the plaintiff, the court should identify the right "at a high level of particularity." Edwards, 178 F.3d at 251. For a plaintiff to defeat a claim of qualified immunity, the contours of the constitutional right "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Hope v. Pelzer, 536 U.S. 730, 739 (2002) (internal quotation marks omitted).

Bland, 730 F.3d at 391. In determining whether a defendant is entitled to summary judgment on the basis of qualified immunity, the Court must consider the facts "'in the light most favorable to the party asserting the injury.'" Tolan v. Cotton, 134 S. Ct. 1861, 1865 (2014) (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)).

Because qualified immunity is an affirmative defense, "'[t]he burden of proof and persuasion with respect to a defense

of qualified immunity rests on the official asserting that defense.'" Durham v. Jones, 737 F.3d 291, 299 (4th Cir. 2013) (quoting Meyers v. Baltimore Cnty., Md., 713 F.3d 723, 731 (4th Cir. 2013)). Accordingly, here, in order to prevail on summary judgment, Defendants must "'show either that there was no constitutional violation or that the right violated was not clearly established.'" Id. (quoting Gregg v. Ham, 678 F.3d 333, 341 n.7 (4th Cir. 2012)).

### 1. "Order Forms"

As discussed in detail above, this Court finds that PLN fails to demonstrate that a constitutional violation occurred through the VBSO's maintenance of an ordering form ban and/or its application of such ban to PLN's publications. Accordingly, as no constitutional violation occurred, Defendants have demonstrated that they are shielded by the doctrine of qualified immunity as to this issue. Durham, 737 F.3d at 299.

Alternatively, even if this Court had denied summary judgment on the merits of the "ordering form" dispute, it would have granted the Defendants qualified immunity on the basis that the right at issue is not "clearly established." Id. The Court agrees with Defendants that the current state of the law would not put them on notice that it was unconstitutional to ban ordering forms in an effort to reduce fraud. Although a lack of "on point" case law does not automatically support a finding of

qualified immunity, such lack of "on point" law, considered in conjunction with cases approving catalog bans or other policies implemented in an effort to prevent fraud on the public clearly support a finding that Defendants are immune from damages on this issue. See, e.g., Woods, 652 F.3d at 749 (upholding policy banning inmate pen-pal solicitations in an effort to reduce fraud); Klein v. Skolnik, No. 3:08cv177, 2010 WL 745418, *3-4 (D. Nev. Jan. 22, 2010) (upholding the constitutionality of a prison's policy of removing magazine subscription renewal "order form" inserts to combat fraud); Dixon v. Kirby, 210 F. Supp. 2d 792, 795, 800-01 (S.D. W. Va. 2002) (upholding as constitutional a policy that banned all "mail order catalogs" but appeared to permit magazines even if they included "advertisements").

## 2. "Sexually Explicit Materials"

A survey of case law clearly demonstrates the unremarkable fact that prisons and jails can constitutionally restrict "pornography" and "sexually explicit" writings and photographs in the name of promoting institutional order and security, which are indisputably valid penological goals. See, e.g., Jordan v. Sosa, 654 F.3d 1012, 1016-17 (10th Cir. 2011) (explaining that federal prison facilities ban publications that include "a pictorial depiction of actual or simulated sexual acts including sexual intercourse," and those that "feature" nudity, which is defined by regulation as "a pictorial depiction where genitalia

or female breasts are exposed"); Bahrampour v. Lampert, 356 F.3d 969, 976 (9th Cir. 2004) (upholding as constitutional a regulation that prohibited inmates from receiving publications that contained images portraying actual or simulated sexual acts or sexual contact, but that permitted some nude images). Here, this Court in no way questions the Sheriff's "common sense" explanation of the risks associated with allowing "sexually explicit" materials into VBCC; however, questions remain as to whether the VBSO's conception of "sexually explicit" materials is constitutionally permissible.

Although this Court takes the parties' cross-motions for summary judgment on the VBSO's sexually explicit material policy under advisement to permit additional briefing, even considering all disputed facts and reasonable inferences in favor of PLN, the Court finds that Defendants have demonstrated that they are entitled to qualified immunity on this issue. Notably, even if this Court assumes that Defendants committed a constitutional violation through censoring monthly issues of *Prison Legal News* based on the application of the VBSO "sexually explicit materials" policy, the "contours of the constitutional right . . . [were not] 'sufficiently clear [such] that a reasonable official would understand that what he [was] doing violates that right.'" Bland, 730 F.3d at 391 (quoting Hope v. Pelzer, 536 U.S. 730, 739 (2002)).

Although the VBSO policy appears to restrict a broader range of materials than policies at issue in similar cases, such fact does not alone support a finding that such policy is unconstitutional, let alone support a finding that such policy violates a "clearly established" constitutional right. Notably, issues of *Prison Legal News* that were barred from VBCC during 2012 and the first half of 2013 included photographs of women and men in lingerie, skimpy swimsuits, or other revealing clothing with the subjects posed in a manner overtly designed to connote that, absent a strategically placed "censor star," the subject was revealing his or her genitals and/or her breasts. Even if this Court assumes that Defendants lacked a valid penological justification for censoring such materials, Defendants have carried their burden to prove the absence of law that would have put Defendants on notice that their conduct was unconstitutional. See Durham v. Horner, 690 F.3d 183, 190 (4th Cir. 2012) (explaining that the "qualified immunity standard gives ample room for mistaken judgments" and is designed to "protect[] public officials from bad guesses in gray areas") (internal quotation marks and citations omitted). Notably, not only is there a lack of controlling precedent demonstrating that censoring *Prison Legal News* based on such images violated the Constitution, but there is at least some non-binding case law holding that arguably similar acts of censorship were

constitutional.  See Elfand v. County of Sonoma, No. C-11-0863, 2013 WL 1007292, at \*4 (N.D. Cal. Mar. 13, 2013) (upholding the constitutionality of a jail's censorship of issues of *Maxim Magazine* and *GQ Magazine* that displayed pictures of woman and men in "underwear, bikinis, and tight and scant clothing revealing breasts and buttocks" to include an image of a woman in a "see-through bra and 'thong' underwear with her buttocks raised").

Because the state of the relevant law, both in 2012, 2013, and today, does not indicate that a jail is prohibited from excluding all incoming publications containing revealing images of individuals in sexual poses overtly intended to sexually arouse the viewer, Defendants' summary judgment motion is **GRANTED** to the extent that Defendants invoke the doctrine of qualified immunity to shield them from money damages associated with the exclusion of the April 2012 through June 2013 issues of *Prison Legal News*.  See Woods v. Director's Review Committee, No. H-11-1131, 2012 WL 1098365, at \*1, (S.D. Tex. Mar. 30, 2012) (concluding that the defendants were entitled to qualified immunity in a case challenging a Texas prison's censorship of nude photos that had been "blurred in such a way as to disguise or cover up any exposed nudity," noting that there was "no clear statement" in the law that would put an official on notice that it was unlawful to ban such images).

Although a closer question, the Court also finds that Defendants have satisfied their burden to demonstrate that they are protected by qualified immunity as to PLN's challenge to the issues of *Prison Legal News* that no longer included advertisements with "censor star" images (July 2013 through April 2014). After the removal of such images, every monthly issue of *Prison Legal News* issued between July 2013 and April of 2014 continued to include images of women in tight fitting clothing, including short skirts and short shorts, tight pants, and clothing that at least appears to be "lingerie." Additionally, some issues contained an image of a woman wearing an erotic top that appears to expose her breasts; however, she is holding up the book being promoted for sale in a manner that obscures the majority of her breasts. Although most of these images are quite small, it is apparent that at least some of the images are designed to either draw attention to the amount of skin being displayed, or to emphasize the subject's buttocks. Additionally, the fact that such images are often included in ads promoting "(non-nude) sexy photos," to include "various backshots & positions" increases the sexual connotation of the images. These images, therefore, could reasonably be viewed as "sexually suggestive," and there is an absence of case law establishing clear lines between sexually oriented materials that can be constitutionally restricted from a jail or prison

and those that cannot. See Tolan, 134 S. Ct. at 1866 ("'[T]he salient question . . . is whether the state of the law' at the time of an incident provided 'fair warning' to the defendants 'that their alleged [conduct] was unconstitutional.'" (quoting Hope, 536 U.S. at 739) (omission and alteration in original)); see also North v. Clarke, No. 3:11cv211, 2012 WL 405162, at *9-10 (E.D. Va. Feb. 7, 2012) (concluding that the defendants were entitled to qualified immunity in a case where the court granted summary judgment in favor of the plaintiff based on the unconstitutionality of the challenged prison regulation).

Defendants have therefore carried their burden to demonstrate that they lacked "fair warning" that their decision to adopt and apply a broad policy aimed in part at sexually "suggestive" materials was unconstitutional. Tolan, 134 S. Ct. at 1866; see Hunter v. Bryant, 502 U.S. 224, 229 (1991) (noting that "[t]he qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law'" (quoting Malley v. Briggs, 475 U.S. 335, 341, 343 (1986))); Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2083 (2011) (explaining that "[a] Government official's conduct violates clearly established law" when existing precedent "placed the statutory or constitutional question beyond debate"). Defendants' summary judgment motion is **GRANTED** to the extent that Defendants invoke the doctrine of

41

qualified immunity to shield them from money damages associated
with the exclusion of the April 2012 through June 2013 issues of
*Prison Legal News* based on the pictures contained therein.

### 3. Due Process

As previously noted, Plaintiff does not seek summary
judgment on its due process claim. Defendants seek summary
judgment on such constitutional claim on the merits, but did not
advance an argument contending that Defendants are shielded from
damages based on qualified immunity, apparently on the belief
that PLN was not pursuing money damages on such claim. ECF No.
48, at 24. PLN thereafter indicated in its filings that while
it was not pursing compensatory damages on this claim, it is
pursuing nominal damages and/or punitive damages. ECF No. 52,
at 18. Defendants' subsequent responsive brief does not address
such statement in the context of qualified immunity, but instead
continues to challenge the merits of Plaintiff's due process
claim.

Based on the foregoing, it does not appear that Defendants
move for summary judgment on the basis of qualified immunity as
to Plaintiff's due process claim, and no ruling is therefore
necessary at this time. Alternatively, to the extent that
Defendants' filings can be interpreted to seek qualified
immunity on this issue, the Court finds that Defendants fail to
carry their burden, and summary judgment is therefore **DENIED** as

42

to such matter. Notably, the governing law appears to be clearly established on this issue, Montcalm Publ'g, 80 F.3d 105,[15] and the questions of fact will dictate whether the policy previously in place at VBCC, either with respect to the alleged failure to provide notice in 2012 and 2013, or alleged failure to conduct a meaningful review of censorship decisions in late 2013, violated such clearly established law.

### V. Respondeat Superior

The Sheriff briefly argues in his summary judgment filings that he is shielded from liability to the extent that he is being sued for damages in his individual capacity only on the theory of respondeat superior. See Harris v. City of Virginia Beach, VA, 11 F. App'x 212, 215 (4th Cir. 2001) ("[A] plaintiff's § 1983 action against a particular defendant must be dismissed if the plaintiff's reason for naming the defendant is based solely upon the theory of respondeat superior" (citing Vinnedge v. Gibbs, 550 F.2d 926, 928 (4th Cir. 1977)). However,

---

[15] Although the Fourth Circuit's opinion in Montcalm Publ'g declined to expressly define the procedure necessary in order to ensure that a sufficient degree of "process" is provided, the Court made the following clear statements:

> (1) "We hold that publishers are entitled to notice and an opportunity to be heard when their publications are disapproved for receipt by inmate subscribers"; and
> (2) "An inmate who cannot even see the publication can hardly mount an effective challenge to the decision to withhold that publication, and while the inmate is free to notify the publisher and ask for help in challenging the prison authorities' decision, the publisher's First Amendment right must not depend on that."

Montcalm Publ'g, 80 F.3d at 106, 109.

for the reasons set forth in PLN's responsive brief, ECF No. 52, at 22, the Court finds that there is sufficient record evidence indicating that the Sheriff was directly involved in relevant events such that the remaining damages claim against him (the due process claim) is not based solely on the theory of respondeat superior. Notably, when viewed in Plaintiff's favor, the record reveals that the Sheriff, at least for a time, participated in the appeal process and acted as the final decision maker as to whether a publication would be barred from VBCC. ECF No. 36-3, at 11-13. Defendants' motion for summary judgment is therefore **DENIED** as to such claim.

## VI. Additional Settlement Discussions

The Court's award of partial summary judgment on the "ordering form" ban and its finding in Defendants' favor as to qualified immunity on both the "ordering form" ban and the "sexually explicit materials" ban resolve a large portion of this case in favor of Defendants. That said, although not resolved in the instant motion, and not prejudged in any way, the current record suggests that PLN has a strong position on its due process claim.[16]  Jordan, 577 F. Supp. 2d at 1172-73.

---

[16] PLN has not moved for summary judgment on its due process claim, but because the parties' request to postpone trial has left sufficient time for additional motions practice, if there is an alleged absence of disputed material facts relevant to this issue, the Court would entertain a request by PLN to file a second summary judgment motion on its due process claim.

Moreover, if not moot, Plaintiff has a potentially meritorious argument on its facial challenge to Defendants' "sexually explicit materials" policy to the extent such policy broadly bans "any writings [or] pictures . . . which may be deemed offensive."[17]    ECF No. 48-4.    Arguably, even under the deferential Turner standard, it is unconstitutional for a jail to exclude publications based on a broad undefined standard whose text does not tie it to any penological concerns, thus leaving it open to being invoked merely because a prison official is personally displeased with the content of "any writing or picture."    Cf. Abbott, 490 U.S. at 404-05, 419 (upholding the facial validity of the federal Bureau of Prisons' restrictions against publications deemed "detrimental to the security, good order, or discipline of the institution," expressly noting that such restrictions prohibit the rejection of a publication "solely because its content . . . is unpopular or repugnant") (emphasis added). A similar argument can be made to the extent that the VBSO policy broadly bans any "material dealing with or displaying . . . scantily clothed persons," because on its face such policy: (1) can be (and arguably has been) applied to ban written text discussing or in any way

---

[17] From the current record, it is unclear what the broad and undefined term "offensive" means, although there is at least some record evidence indicating that "offensive" means "sexually offensive." ECF No. 36-5, at 3.

"dealing with," in less than graphic detail, a person wearing underwear or a bathing suit; and (2) can be (and arguably has been) applied to ban any image of a person in a bathing suit regardless of the sexual connotation of such image and regardless of the image's likely impact on penological concerns. Cf. Couch v. Jabe, 737 F. Supp. 2d 561, 567-71 (W.D. Va. 2010) (indicating that the "expansive reach" of a Virginia Department of Corrections prohibition on all explicit descriptions of sexual acts, to include "[a]ny sexual acts in violation of state or federal law" is overbroad even under the undemanding Turner reasonableness standard because it reaches a wealth of written material, including great literary works of art, that could not "have any effect on the security, discipline, and good order of the prison"); Aiello v. Litscher, 104 F. Supp. 2d 1068, 1079-82 (W.D. Wis. 2000) (denying the defendants' summary judgment motion, recognizing that although there is surely a rational connection between a prison ban on explicit pornography and advancing legitimate penological goals, the defendants had not demonstrated a valid rational connection between such goals and the broadly sweeping regulation at issue, specifically noting that the record "reveals no debate among scholars or experts on the effect on rehabilitation of great works of art and literature, [such as nude images from the Sistine Chapel] . . . and common sense suggests none") (emphasis added).

In light of the fact that Defendants have prevailed on a substantial portion of this case, yet Plaintiff remains in a position where it could prevail on one or more outstanding issues, counsel for both parties are **INSTRUCTED** to meet and confer to discuss whether a resumption of the previously conducted settlement conference may prove fruitful. As in all civil disputes, this Court encourages the parties to seriously consider the benefits of a negotiated settlement, noting that in this case in particular the current record suggests a potential benefit to both parties in reaching such a stipulated resolution, as the record at least suggests that both parties may have an interest in the VBSO improving its sexually explicit materials policy (as it twice revised and improved its due process policy associated with rejected publications) in order to more closely tie the text of the policy to the goal of excluding materials that might affect internal safety and associated penological concerns.

## VII. Conclusion

For the reasons set forth in detail above, the Court **TAKES UNDER ADVISEMENT** the parties' cross motions for summary judgment as to the constitutionality of Defendants' "sexually explicit materials" policy in order to permit additional briefing on such subject. As to the cross motions for summary judgment on Defendants' "ordering form policy," Defendants' motion is

47

**GRANTED** and Plaintiff's motion is **DENIED**. Additionally, the Court **GRANTS** Defendants' motion for summary judgment to the extent Defendants invoke the doctrine of qualified immunity as to both the ordering form ban and sexually explicit materials ban. All other arguments in support of summary judgment contained in the cross motions are **DENIED**.

Counsel for both parties are **INSTRUCTED** to meet and confer in person within 21 days of the issuance of this Opinion and Order to discuss whether the resumption of the settlement conference previously conducted in this case would prove fruitful. The parties shall file with the Court, jointly or separately, a "status update" no later than Wednesday, January 7, 2015, indicating their position on whether a briefing schedule should be set by the Court for supplemental summary judgment briefs or whether the parties would prefer to resume settlement discussions with a Magistrate Judge prior to being ordered to submit further briefing on the issue of summary judgment.

The Clerk is **REQUESTED** to send a copy of this Opinion and Order to all counsel of record.

IT IS SO ORDERED.

/s/

Mark S. Davis
United States District Judge

United States District Judge

December 8 , 2014