UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division



PRISON LEGAL NEWS, a project of the
HUMAN RIGHTS DEFENSE CENTER,

        Plaintiff,

v.                                  Civil No. 2:13cv424

KEN STOLLE, Sheriff for Virginia
Beach, Virginia, et. al,

        Defendants.


### OPINION AND ORDER

This matter is before the Court on a second motion for partial summary judgment filed by Prison Legal News, a project of the Human Rights Defense Center, ("Plaintiff," or "PLN"), ECF No. 77, as well as a reserved issue in Plaintiff's original motion for partial summary judgment, ECF No. 35. Also pending is a previously reserved portion of a cross motion for summary judgment filed collectively by Ken Stolle, Sheriff for Virginia Beach, Virginia ("the Sheriff"), and the eight named defendant employees of the Virginia Beach Sheriff's Office (collectively with the Sheriff, "Defendants"). ECF No. 49. On December 8, 2014, this Court issued a detailed Opinion and Order resolving the majority of the parties' initial cross motions for summary judgment, but reserved ruling on the parties' dispute related to

the constitutionality of the "sexually explicit materials" policy adopted by the Sheriff and implemented by Defendants at the Virginia Beach Correctional Center ("VBCC"). The Court having now received additional briefing on the reserved issue, and having conducted an on-the-record conference call with the parties on March 17, 2015, the prior motions on the sexually explicit materials policy, as well as Plaintiffs' more recently filed motion seeking summary judgment on a due process claim, are ripe for review.

## I. Factual and Procedural Background

This Court previously outlined the relevant factual and procedural background in detail in its December 8, 2014 Opinion and Order, and such background is incorporated by reference herein. In short, PLN is the publisher of a monthly magazine titled "*Prison Legal News*," which is marketed mainly to inmates. Over the past several years, inmates at VBCC, which is operated by Sheriff Stolle and the Virginia Beach Sheriff's Office ("VBSO"), have not been permitted to receive the monthly *Prison Legal News* magazine. This Court's prior Opinion upheld the constitutionality of Defendants' decision not to allow past issues of such magazine into the VBCC based on the VBSO ban on all incoming publications that contain "ordering forms" with prices. The Court reserved ruling on the alternative reason for rejection of past issues of *Prison Legal News* based on various

2

non-explicit, but arguably "sexually suggestive," advertisements contained therein, with such ads displaying varying degrees of sexually suggestive photographs across different issues of *Prison Legal News*.

Subsequent to this Court's December 2014 Opinion, both parties filed supplemental briefs regarding the constitutionality of the VBSO sexually explicit materials policy, and the briefs address whether such legal issue is moot in light of either: (1) this Court's prior ruling on the ordering form policy; and/or (2) the VBSO's recent adoption of a new sexually explicit materials policy. Additionally, PLN requested, and was granted, leave to file a second motion seeking partial summary judgment, the second motion focusing on PLN's allegations that the VBSO's notice and review policy associated with censoring incoming publications (hereinafter "publication review policy") was unconstitutional as it failed to provide publishers with adequate notice and/or an adequate opportunity to be heard when the VBSO prohibited a certain publication from entering the VBCC. Notably, while the instant action was pending, the VBSO has <u>twice</u> amended its publication review policy, with both voluntary changes occurring prior to this Court's issuance of its December 8, 2014 Opinion.

Notwithstanding the fact that compensatory damages are no longer at issue in this case, and the fact that Defendants have

modified, and unquestionably improved from a constitutional standpoint, both the VBSO sexually explicit materials policy and the VBSO publication review policy, as confirmed during the March 17, 2015 conference call, the parties are unable to resolve their disputes as to the now-abandoned policies. This Court therefore now proceeds to resolving the pending motions.

## II. Standard of Review

The Federal Rules of Civil Procedure provide that a district court shall grant summary judgment in favor of a movant if such party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby Inc., 477 U.S. 242, 247-48 (1986). A fact is "material" if it "might affect the outcome of the suit," and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248.

If a movant has properly advanced evidence supporting entry of summary judgment, the non-moving party may not rest upon the mere allegations of the pleadings, but instead must set forth specific facts in the form of exhibits, sworn statements, or

other materials that illustrate a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986); Fed. R. Civ. P. 56(c). At that point, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. In doing so, the judge must construe the facts and all "justifiable inferences" in the light most favorable to the non-moving party, and the judge may not make credibility determinations. Id. at 255; T-Mobile Northeast LLC v. City Council of City of Newport News, Va., 674 F.3d 380, 385 (4th Cir. 2012).

When confronted with cross motions for summary judgment, "the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks and citation omitted). As to each separate motion, the Court must separately resolve factual disputes and competing rational inferences in favor of the non-movant. Id.

### III. Discussion

#### A. Legal Standard Governing Restrictions on Incoming Publications at a Prison/Jail

This Court's prior Opinion in this case provided a detailed survey of the applicable law governing the constitutionality of

censoring incoming publications at a prison or jail, ECF No. 65, at 7-10, and such analysis is incorporated by reference herein. In short, it is well-established in the Fourth Circuit that, notwithstanding "the First Amendment's somewhat limited reach in the prison context," publishers have a First Amendment right to communicate with inmate subscribers. Montcalm Publ'g Corp. v. Beck, 80 F.3d 105, 109 (4th Cir. 1996). That said, district courts are required to give substantial deference to prison officials in all matters of institutional management, with the standard for reviewing a challenge to a prison policy requiring the Court to consider:

> (1) whether there is a "valid, rational connection" between the prison regulation or action and the interest asserted by the government, or whether this interest is "so remote as to render the policy arbitrary or irrational"; (2) whether "alternative means of exercising the right . . . remain open to prison inmates" . . . ; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether there exist any "obvious, easy alternatives" to the challenged regulation or action, which may suggest that it is "not reasonable, but is [instead] an exaggerated response to prison concerns."

Lovelace v. Lee, 472 F.3d 174, 200 (4th Cir. 2006) (quoting Turner v. Safley, 482 U.S. 78, 89-92 (1987)) (first omission in original) (hereinafter "the Turner test"). In applying the Turner test, it is the party challenging the prison regulation that "bears the burden of showing that the [challenged] regulations . . . are not reasonably related to legitimate

penological objectives, or that they are an 'exaggerated response' to such concerns." Prison Legal News v. Livingston, 683 F.3d 201, 215 (5th Cir. 2012) (citing Overton v. Bazzetta, 539 U.S. 126, 132 (2003); Turner, 482 U.S. at 87)). Although such burden falls squarely on PLN in this case, Defendants are required to at least articulate a rationale in support of the disputed polices such that the Court can perform a meaningful review of the challenged policy under Turner. Beard v. Banks, 548 U.S. 521, 535 (2006) (plurality opinion); see Van den Bosch v. Raemisch, 658 F.3d 778, 786 (7th Cir. 2011) ("While the burden of persuasion is on the [plaintiff] to disprove the validity of a [prison] regulation, defendants must still articulate their legitimate governmental interest in the regulation.") (citations omitted).

## B. Outstanding Summary Judgment Claims

PLN's first motion for partial summary judgment challenges the former VBSO policy banning from VBCC "sexually explicit" publications, which extended to photos and writings deemed "offensive" and materials dealing with "scantily clothed persons." ECF No. 48-4. PLN's second motion for partial summary judgment challenges the former VBSO publication review policy, arguing that it failed to provide constitutionally adequate "notice" and an "opportunity to be heard" after an incoming publication was rejected by the VBSO.

Defendants' cross motion for partial summary judgment opposes PLN's constitutional challenge to the former VBSO sexually explicit materials policy, asserting that Defendants are entitled to summary judgment on such issue because the former policy was constitutionally proper under Turner. Defendants' cross motion for summary judgment on the former VBSO publication review policy is no longer pending as it was denied in this Court's December 8, 2014 Opinion and Order.

### C. Analysis

### 1. Mootness

This Court previously invited the parties to address whether or not the dispute over the former VBSO sexually explicit materials policy was "moot" due to the Court's ruling in favor of Defendants on the VBSO "ordering form" policy in light of the fact that it is undisputed that every relevant issue of *Prison Legal News* that was excluded from the VBCC contained ordering forms. Additionally, as noted above, the VBSO adopted a new sexually explicit materials policy after this Court issued its prior Opinion, and Defendants therefore argue that the adoption of such new policy constitutes separate grounds for finding this issue to be moot.

Having carefully considered the parties' supplemental filings, the Court finds that Defendants, the parties asserting mootness, have failed to demonstrate either that this Court's

prior ruling, or the VBSO's adoption of new sexually explicit materials and publication review policies, have mooted the disputes remaining in this case. As to the change in policies, which is the primary focus of the parties' briefs, Defendants have failed to demonstrate that, subsequent to the termination of this litigation, they will not re-implement the challenged policies. Notably, as recently explained by the Fourth Circuit:

> It is well established that a defendant's "voluntary cessation of a challenged practice" moots an action only if "subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 189; see Knox v. Service Employees Int'l Union, Local 1000, 132 S. Ct. 2277, 2287 (2012) ("The voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed."). Were it otherwise, "courts would be compelled to leave '[t]he defendant . . . free to return to his old ways.'" City of Mesquite v. Aladdin's Castle, 455 U.S. 283, 289 n.10 (1982) (quoting United States v. W.T. Grant Co., 345 U.S. 629, 632 (1953)). "The 'heavy burden of persua[ding]' the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." Laidlaw, 528 U.S. at 189, (quoting United States v. Concentrated Phosphate Export Ass'n, 393 U.S. 199, 203 (1968)).

Wall v. Wade, 741 F.3d 492, 497 (4th Cir. 2014) (alterations in original).

Here, Defendants have never acknowledged that the prior VBSO policies are unconstitutional, nor has the Sheriff, or any other Defendant, submitted an affidavit stating, even without

admitting the unconstitutionality of the prior policies, that the prior policies are at least constitutionally suspect, and therefore, will never be reimplemented by the VBSO. Accordingly, Defendants do not point to any legal or practical barrier preventing them from readopting the disputed policies, and they have failed to even offer a bald conclusory pledge not to return to such policies. See id. ("[W]hen a defendant retains the authority and capacity to repeat an alleged harm, a plaintiff's claims should not be dismissed as moot."). As a result, Defendants have clearly failed to meet their "heavy burden," and this Court will proceed to consider the merits of PLN's claims as to both the former VBSO sexually explicit materials policy and former VBSO publication review policy.[1]

## 2. Former VBSO Sexually Explicit Materials Policy

PLN's initial motion for partial summary judgment and supporting memoranda challenge Defendants' policy banning from VBCC "sexually explicit" photos or publications, which under the former VBSO policy, extended not only to what is traditionally

---

[1] This Court's earlier concern regarding mootness based on its prior ruling centered on whether PLN's "as applied" challenge to the sexually explicit materials policy was moot in light of the fact that this Court already concluded that the exclusion of the same issues of Prison Legal News, that form the basis for this claim, was constitutional on other grounds. Defendants' briefs, however, fail to demonstrate that this Court's prior ruling renders such issue moot. Moreover, even if the "as applied" challenge were deemed moot, as described above, in light of the Sheriff's failure to acknowledge under oath that he is prohibited from returning to the prior sexually explicit materials policy on constitutional grounds, the facial challenge to such policy would plainly remain a live controversy.

considered "pornography," but also to "any writings [or] pictures . . . which may be deemed offensive" as well as to "material dealing with or displaying . . . scantily clothed persons." ECF No. 48-4. PLN advances both a "facial" challenge to such policy and an "as applied" challenge, and does not dispute Defendants' assertion that the Turner test applies to both types of challenges. See Bahrampour v. Lampert, 356 F.3d 969, 975 (9th Cir. 2004) ("The Turner analysis applies equally to facial and 'as applied' challenges."); Wardell v. Duncan, 470 F.3d 954, 963 (10th Cir. 2006) (applying Turner to an inmate's "as applied" challenge to a mail restriction); see also Educational Media Co. at Virginia Tech, Inc. v. Insley, 731 F.3d 291, 298 n.5 (4th Cir. 2013) (describing, in a case not involving the prison context, that the "difference between a facial challenge and an as-applied challenge lies in the scope of the constitutional inquiry," with the first focusing on the policy "without regard" to its impact on the plaintiff, and the second focusing on how such policy is applied to a specific person or entity). Defendants oppose PLN's motion and separately seek summary judgment in their favor on this issue, arguing that the former VBSO sexually explicit materials policy was constitutional in light of the wide-latitude that prison officials are afforded in this arena.

A survey of case law on the issue of prison regulations on sexually themed materials plainly demonstrates that, notwithstanding a private citizen's First Amendment right to possess what can be generally categorized as "adult pornography," prison and jail administrators can constitutionally restrict pornography and similar "sexually explicit" writings and photographs. See, e.g., Bahrampour, 356 F.3d at 976 (upholding as constitutional an Oregon Department of Corrections regulation that prohibited inmates from receiving publications that contained images portraying actual or simulated sexual acts or sexual contact, but that permitted nude images); Jones v. Salt Lake County, 503 F.3d 1147, 1155-56 (10th Cir. 2007) (upholding as constitutional a county jail's ban on "sexually explicit material" that included a ban on photographs of exposed "breasts and genitals" but did not extend to "sexually explicit prose or pictures of clothed women/men"). As to federal prison facilities, the Federal Bureau of Prisons ("BOP") applies a statue passed by Congress in 1996 known as the "Ensign Amendment," which precludes federal prisons from distributing or making available to prisoners "any commercially published information or material that is sexually explicit or features nudity." 28 U.S.C. § 530C(b)(6). "In response to the Ensign Amendment, the BOP promulgated an implementing regulation that narrows the scope of the statute by defining key statutory

terms," and interprets the Ensign Amendment as applying only to pictorial representations.[2] Jordan v. Sosa, 654 F.3d 1012, 1016-17 (10th Cir. 2011) (citing 28 C.F.R. § 540.72). Such regulation defines "nudity" as "a pictorial depiction where genitalia or female breasts are exposed," and defines "sexually explicit" as "a pictorial depiction of actual or simulated sexual acts including sexual intercourse, oral sex, or masturbation." 28 C.F.R. § 540.72(b). Additionally, the regulation defines "features," as used in the Ensign Amendment, to mean that the "publication contains depictions of nudity or sexually explicit conduct on a routine or regular basis or promotes itself based upon such depictions in the case of individual one-time issues," and includes an exception for "[p]ublications containing nudity illustrative of medical, educational, or anthropological content." Id.; see Amatel v. Reno, 156 F.3d 192, 202 (D.C. Cir. 1998) (finding "that the [Ensign Amendment] and regulation satisfy [Turner v.] Safley's demand for reasonableness, scoring adequately on all four factors"). The currently in force BOP "Program Statement" governing "Incoming Publications" further discusses BOP requirements, noting that a warden must consider each

---

[2] Although the implementing regulation limits the Ensign Amendment to pictures that are sexually explicit or contain nudity, a separate BOP regulation can be invoked to exclude a sexually explicit writing that "by its nature or content poses a threat to the security, good order, or discipline of the institution, or facilitates criminal activity." 28 C.F.R. § 540.71(b)(7); see Jordan, 654 F.3d at 1017.

publication on an issue-by-issue basis before it is rejected, and provides examples of publications that are generally allowed, such as: (1) *National Geographic*, even if it contains nudity; and (2) "*Sports Illustrated* swimsuit issues" and "Lingerie catalogs," unless they contain nudity. BOP Program Statement 5266.11, Nov. 9, 2011, available at http://www.bop.gov/policy/progstat/5266_011.pdf.[3]

Although not applicable to the VBCC, the Virginia Department of Corrections ("Virginia DOC") appears to apply a more lenient standard than the federal BOP, as it does not expressly prohibit "nudity," but instead excludes publications that "emphasize[] explicit or graphic depictions or descriptions of sexual acts." Virginia DOC Operating Procedure 803.2: Incoming Publications § IV.G, effective Jan. 1, 2015, available at https://vadoc.virginia.gov/about/procedures/documents/800/803-2.pdf.[4] The Virginia DOC rule is followed by a "Note" that

---

[3] The federal BOP program statement was not expressly relied on by the parties to this case. However, it was cited within prior federal opinions on this issue, and was considered by this Court in the context of fully understanding the reasoning of such prior opinions.

[4] The Court notes that, on March 17, 2015, the Governor of Virginia signed HB 1958 which relates to the powers and duties of the "Board of Directors" of the Virginia DOC as well as the "Director" of the DOC. Such newly enacted law provides that the DOC Board of Directors and the DOC Director have the power and duty to adopt, promulgate, and enforce "regulations prohibiting the possession of obscene materials, as defined and described in Article 5 (§ 18.2-372 et. seq.) of Chapter 8 of Title 18.2, by prisoners incarcerated in state correctional facilities." Va. Acts of Assembly-2015 Session, Chapter 293, H 1958 (approved March 17, 2015), available at https://lis.virginia.gov/cgi-

clarifies: "This criterion shall not be used to exclude publications that describe sexual acts in the context of a story or moral teaching unless the description of such acts is the primary purpose of the publication. No publication generally recognized as having artistic or literary value should be excluded under this criterion. . . ." Id.; cf. Couch v. Jabe, 737 F. Supp. 2d 561, 567 (W.D. Va. 2010) (rejecting as unconstitutional under Turner a prior version of Virginia Operating Procedure 803.2 as it excluded all publications that included any "descriptions of sexual acts," explaining that "it is unlikely that a cogent argument could be advanced which would explain how a regulation which forbids James Joyce's Ulysses, but permits Hugh Hefner's Playboy, has a rational relationship" to maintaining the "security, discipline, and good order in the facility").

The Court has considered the parties' briefs and an array of federal cases applying the Turner test to the various approaches taken by federal, state, and local prison and jail

---

bin/legp604.exe?151+ful+CHAP0293+pdf. As the contemplated regulations have not yet been adopted, it is impossible to predict the future Virginia DOC standard for regulating incoming publications that contain material that is sexual in nature. That said, the newly enacted law's cross-reference to § 18.2-372, which defines obscenity, arguably suggests that any such regulation will not ban images that display non-sex act nudity, as the Virginia Supreme Court has long-recognized that the Virginia statute defining obscenity "limits the class of works which might be found obscene to portrayals of sexual activity or excretion, not including mere nudity, which go beyond the customary limits of candor in representing such matters." Price v. Commonwealth, 214 Va. 490, 493 (1974) (emphasis added).

facilities to regulate sexually explicit materials and/or nude images (to include broad definitions of "nudity"). After carefully considering the case-specific facts in the record as presented to this Court, the Court finds that, even taking the evidence in a light most favorable to Defendants, as is required when analyzing PLN's summary judgment motion, the challenged former policy lacks a rational connection to a valid penological goal because it was so broad as written, and as applied to PLN, that it allowed for the exclusion of publications based on an amorphous standard untethered to valid prison concerns. Although Defendants surely assert valid penological objectives for banning sexually explicit images, the record demonstrates that the former VBSO policy was so broad that it lacked a "valid, rational connection" to such objectives, and "a regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." Turner, 482 U.S. 89-90. Although a discussion of all four Turner factors follows below, the Court provides the most in depth discussion of the first factor, as relevant case law and common sense both suggest that "the first factor looms especially large," and that such inquiry may in some circumstances "tend[] to encompass the remaining factors." Amatel, 156 F.3d at 196; see Van den Bosch v. Raemisch, 658 F.3d 778, 785 n.6 (7th Cir. 2011) (noting that,

"though each of the factors is relevant in assessing the reasonableness of a regulation . . . the first factor serves as a threshold") (internal quotation marks and citations omitted).

### a. Rational Connection

This Court begins its analysis under Turner by reiterating that it affords substantial deference to administrators in the exceedingly difficult arena of managing a jail or prison. Lovelace, 472 F.3d at 199; see United States v. Stotts, 925 F.2d 83, 86 (4th Cir. 1991) (explaining that a heightened scrutiny standard would result in unworkable intertwinement of the courts in difficult institutional judgments, and therefore, the proper approach for a reviewing court is "one of caution"). Moreover, the Court reiterates that the burden is "not on [Defendants] to prove the validity of prison regulations but on the [Plaintiff] to disprove it." Overton, 539 U.S. at 132. That said, the Court is mindful of the Supreme Court's "confidence" that the Turner reasonableness standard, while not particularly onerous, "is not toothless." Thornburgh v. Abbott, 490 U.S. 401, 414 (1989).

The first step of the Turner analysis requires the Court to consider whether, based on the record before it, there is a "valid, rational connection" between the former VBSO sexually explicit materials policy and a valid penological goal, or whether the goal is "so remote as to render the policy arbitrary

or irrational." Turner, 482 U.S. at 89-90. When applied to pictures or text, the broad VBSO former policy allowed for censorship based on the content being deemed "offensive" or because it merely dealt with "scantily clothed persons." Such standard was not tied in any way to the context of the photograph or writing, nor was it written in a manner that tied censorship to institutional security concerns. The first part of the former standard appears on its face to allow for viewpoint-based censorship of photos or writings as a publication could be rejected merely because a jail official was personally displeased with the content of "any writing or picture" and thus deemed it "offensive." [5] Cf. Abbott, 490 U.S. at 404-05, 419 (upholding the facial validity of the federal BOP restriction prohibiting publications deemed "detrimental to the security, good order, or discipline of the institution," expressly noting that such restrictions prohibit the rejection of a publication "solely because its content . . . is unpopular or repugnant") (emphasis added). The second part of the VBSO standard, broadly banning any "material dealing with or

---

[5] There is no evidence in this case that such standard was actually applied in a manner intended to suppress any specific viewpoint, and the Court does not intimate in any way that Defendants targeted any person, entity, or group. Moreover, the record indicates that such standard was not authored by the current Sheriff, but was instead adopted from the rule in place from the prior administration. That said, the face of the policy does not withstand constitutional scrutiny.

displaying  .  .  .  scantily  clothed  persons," did  not
differentiate  between  a  graphic  photograph  of  a  nude  or  near
nude  model  in  an  overtly  sexual  position  and  a  picture  of  a
family  in  bathing  suits  at  the  beach,  or  a  reproduction  of  a
centuries  old  oil  painting  depicting  a  non-nude,  but  "scantily
clothed,"  subject  in  a  non-sexual  context.  Accordingly,  the
former  VBSO  policy:  (1)  can  be  (and  has  been)  applied  at  VBCC  to
ban  written text  "dealing  with,"  in  non-graphic  detail,  a  naked
or  scantily  clothed  person;[6]  and  (2)  can  be  (and  apparently  has
been)  applied  to  ban  any  image  of  a  person  in  a  bathing  suit
regardless  of  the  context.[7]  Cf. Couch,  737  F.  Supp.  2d  at  567-71
(indicating  that  the  "expansive  reach"  of  a  Virginia  DOC
prohibition  on  all  explicit  descriptions  of  sexual  acts,  to
include  "[a]ny  sexual  acts  in  violation  of  state  or  federal
law,"  is  overbroad  even  under  the  undemanding  Turner
reasonableness  standard  because  it  reaches  a  wealth  of  written
material,  including  literary  works  of  art,  that  could  not  "have
any  effect  on  the  security,  discipline,  and  good  order  of  the

---

[6] After  the  instant  lawsuit  was  filed,  certain  advertisements  in  later
issues  of  Prison Legal News  that  discussed  photographs  of  nude  models
or  near-nude  models  were  identified  as  prohibited  under  the  former
VBSO  sexually  explicit  materials  policy  even  though  they  contained  no
pictures.  See  ECF  Nos.  43-2,  at  2,  42-1,  at  27.

[7] The  record  indicates  that  magazines  including  any  images  of  "scantily
clad  women"  were  not  permitted  to  enter  the  VBCC  under  the  former
policy.  See  ECF  No.  36-6  at  5  (indicating  that  issues  of  ESPN
Magazine  and  Sports Illustrated Magazine  were  banned  for  having
"scantily  clad  women,"  which  included  images  "even  in  a  bathing
suit").

prison"); <u>Aiello v. Litscher</u>, 104 F. Supp. 2d 1068, 1079-82 (W.D. Wis. 2000) (denying the defendants' summary judgment motion, recognizing that although there is surely a rational connection between a prison ban on explicit pornography and advancing legitimate penological goals, the <u>defendants had not demonstrated a valid rational connection between such goals and the broadly sweeping regulation at issue</u>, specifically noting that the record "reveals no debate among scholars or experts on the effect on rehabilitation of great works of art and literature, [such as nude images from the Sistine Chapel] . . . <u>and common sense suggests none</u>") (emphasis added).

As discussed in this Court's prior Opinion addressing Defendants' qualified immunity as to money damages on this issue, the Court has no reason to question Defendants' good-faith efforts to seek to bar <u>sexually explicit</u> materials from VBCC. However, the former VBSO policy, as applied to PLN, banned: (1) issues of *Prison Legal News* based on images of women in mini-skirts or tight clothing; and (2) issues of *Prison Legal News* based on text-only ads that included no photos of any kind. <u>See</u> ECF Nos. 41-2, 42-1, 43-2, 48-18, 48-19 (demonstrating that certain issues of *Prison Legal News* were rejected by Defendants on the basis of the inclusion of "sexually suggestive ads" based

on images of women in short skirts or tight fitting clothing);[8]
ECF Nos. 43-2, at 2, 42-1, at 27 (demonstrating that certain
issues of *Prison Legal News* were rejected by Defendants, in
part, for containing "sexually suggestive ads" when the ads were
<u>text-only</u> and described catalogs/pictures of "gorgeous ladies"
and "beauties posing just for you," available for purchase in
either "nude" or "BOP friendly" non-nude formats without further
describing the actual images in any degree of detail.

This Court, in agreement with PLN's characterization of the
relevant federal law on this issue, is unaware of any other
federal court upholding the constitutionality of such a broad
restriction on "scantily clothed" individuals, to include those
in a bathing suit, regardless of context.[9]   Moreover, even with

---

[8] It appears that one or two of the thumbnail images in certain
advertisements in issues of *Prison Legal News* in late 2013 and early
2014 arguably could be described as not just short skirts, but as
"lingerie." <u>See, e.g.</u>, ECF No. 42-1, at 9, 25.   However, such images
measure only approximately ½ inch tall by ½ inch wide.   The size and
difficulty in making out what such images even depict further
suggests that barring *Prison Legal News* on the basis of such thumbnail
images was an "exaggerated response."  <u>Cf. Smith v. Roy</u>, No. 10-2193,
2012 WL 1004985, at *10 (D. Minn. Jan. 25, 2012) (noting that only
publications that "feature" nudity were banned by the relevant
regulation, and that such determination "is based in part on the ratio
of nude images to the total number of pages of the publication [and]
the manner in which the nude images are displayed (including size)").

[9] One of the broadest restrictions on publications of which this Court
is aware that has been upheld as constitutional is a Kansas DOC
administrative regulation that precludes inmates from possessing
material if: (1) "the purpose of the material is sexual arousal or
gratification"; <u>and</u> (2) the material contains either display or
simulation of sex acts or "[c]ontains nudity" which is defined as "the
depiction or display of any state of undress in which the human
genitals, pubic region, buttock, or female breast at a point below the

the substantial deference owed to prison authorities, multiple

district court opinions support this Court's finding that

Defendants' former policy fails to pass constitutional muster as

it permitted censorship based on images or writings involving

---

top of the aerola [sic] is less than completely and opaquely covered."
Kan. Admin. Regs. 44-12-313.   In Strope v. Collins, 492 F. Supp. 2d
1289 (D. Kan. 2007) the district court denied cross motions for
summary judgment filed on an undeveloped record, noting that "in the
absence of any meaningful argument from the parties under the four
Turner factors, a genuine issue of material fact exists precluding
summary judgment in favor of either party about whether the regulation
is reasonably related to legitimate penological interests."   Id. at
1296.   The Court further explained that denial of the cross motions
was particularly appropriate because "there appears to be no precedent
upholding the constitutionality of a regulation that contains as broad
of a prohibition as the KDOC regulation in the manner in which it is
being applied in this case," which involved "the censorship of entire
publications because they contain what appears to be a few photographs
of women's partially bare buttocks."   Id.   Later in that same case,
the Court granted summary judgment in favor of the defendants after
the record was further developed and the Court received an affidavit
from the "Secretary" of the Kansas Department of Corrections
specifically outlining the penological concerns associated with
"materials containing depictions of bare buttocks."   Strope v.
Collins, No. 06-3150-JWL, 2008 WL 2435560, at *2-3 (D. Kan. June 12,
2008).   In reaching this conclusion, the district court acknowledged
that the material at issue in that case "included images of women
wearing various types of underwear (thong-style, high cut, etc.) in
such a way as to reveal their partially bare buttocks" which "would
more accurately be characterized as sexy, revealing images rather than
pure pornography, in the more traditional sense of that word" but
nevertheless concluded that, in line with the regulation, "the only
plausible purpose for the censored images is sexual pleasure."   Id. at
*6; see also Elfand v. County of Sonoma, No. C-11-0863, 2013 WL
1007292, at *2 (N.D. Cal. Mar. 13, 2013) (banning images that have
"the purpose of arousing sexual stimulation in its intended audience"
if prison authorities have a "reasonable belief" that the banned
images would jeopardize "safety, security, rehabilitation or other
legitimate Facility interests"); Smith, 2012 WL 1004985, at *7, *10
(upholding the constitutionality of a correctional facility policy
banning publications that feature "nudity," to include woman in
swimsuits or lingerie that are "see-through" or otherwise display "a
substantial portion of the [female] breast below the nipple," but
noting as part of the Turner analysis that prisoners "can receive a
publication that contains a nude photograph because publications are
only prohibited if they 'feature' nudity," and that "photographs that
show only cleavage or buttocks are not prohibited").

"scantily clothed" persons regardless of any sexual connotation and making no exception for materials widely accepted as having educational and/or artistic value, and it permitted viewpoint based censorship stemming from the censor's decision that an image or writing was "offensive." See Prison Legal News v. County of Ventura, No. 14-0773, 2014 WL 2736103, at *9 n.6, *9-10 (C.D. Cal. June 16, 2014) (indicating that not only did the defendants concede that their past practice of barring all "sexually suggestive" images was unconstitutional, but that the district court subjected such prior practices to its own analysis and concluded that a preliminary injunction was warranted to preclude the county jail from "refus[ing] to deliver copies of publications from Plaintiff or other publishers on account of sexually 'suggestive' content unless the publication contains actual nudity or graphic depictions of sexual acts"); Boyd v. Stalder, No. 03-1249-P, 2006 WL 3813711, at *6 (W.D. La. Dec. 27, 2006) (denying cross motions for summary judgment as to a prison's then-abandoned policy of banning "all publications that featured women in 'sexy poses' even if they were fully clothed," noting that Defendants "devote scant attention to this aspect of Plaintiff's claims, and they cite no authority that would authorize such a broad . . . ban in the general population of a prison");[10] Abbott, 490 U.S. at 404-

---

[10] In Boyd, after a jury trial resulted in a hung jury, the district

05, 419 (upholding the facial validity of the federal BOP's image restriction expressly tied to "security" and "good order" of the prison, expressly noting that such restrictions prohibit the rejection of a publication "solely because its content . . . is unpopular or repugnant"); Aiello, 104 F. Supp. 2d at 1079-82 (denying the defendants' summary judgment motion in a case involving a prison's broadly sweeping censorship policy, noting that while there is "no doubt that defendants could craft and implement a regulation" censoring sexually explicit photographs, the regulation in question "in effect sweeps so broadly as to capture much pictorial and written material for which there is no . . . rational connection" to prison security or rehabilitation). Notably, here, Defendants have not articulated any basis for treating a picture of a woman or man in a bathing suit, or a picture of a woman in a mini-skirt, or great works of art portraying a subject with minimal clothing, or a written paragraph describing a "scantily clothed" individual, the same

---

court denied a renewed motion for summary judgment seeking qualified immunity, explaining that the warden's testimony failed to establish a "valid rational connection" between the ban on "all general population inmates receiving . . . publications with non-obscene matters such as pictures of women in bikinis or miniskirts." Boyd v. Stalder, No. 03-1249-P, 2008 WL 2977363, at *3 (W.D. La. Aug. 1, 2008). While this Court specifically does not adopt the qualified immunity analysis set forth therein, such opinion evidences the lack of authority upholding as constitutional broad bans on publications because they contain pictures of women in "short skirts" or "tight pants." Id. at *5.

as a publication featuring traditional "pornography."[11]  To the
contrary, Defendants essentially rest their penological
justification for the former VBSO policy on the assertion that

_____

[11] There is an inherent difficulty in attempting to portray the
contours and tenor of the images at issue in this case through words
alone.  See F.C.C. v. CBS Corp., 132 S. Ct. 2677, 2678 (2012)
(Roberts, C.J., concurring in the denial of certiorari) ("As every
schoolchild knows, a picture is worth a thousand words . . . .").
That said, borrowing from what is likely familiar terminology to any
reader, the Court characterizes the images included in the late 2013
and early 2014 issues of Prison Legal News as "thumbnail" images best
described as consistent with a "PG" rating, whereas the challenged
policy (and limited explanation for such policy) appears to have
treated such images no differently than a full page "R" rated image.
Two such advertisements are reproduced below in a format that
approximates the size/format in which they appeared in multiple issues
of Prison Legal News.  See, e.g., ECF No. 42-1, at 9, 25.



it should be "obvious" why any visual depiction of a scantily clothed person must be banned. However, in light of the widespread existence of far more lenient policies in all federal and Virginia DOC facilities located within the Commonwealth of Virginia, which either allow nude or "near-nude" non-sex act photos, the penological justification for the VBSO policy prohibiting photos of individuals "even in a bathing suit" is anything but obvious.[12] See Wolf v. Ashcroft, 297 F.3d 305, 308-09 (3d Cir. 2002) ("Whether the requisite connection [between the policy and the penological goal] may be found solely on the basis of 'common sense' will depend on the nature of the right, the nature of the interest asserted, the nature of the

---

[12] When the Sherriff was asked in his deposition why sexually explicit materials were not allowed in the VBCC under the former policy, his response revealed that, in his opinion, it was obvious that allowing what he considered to be sexually explicit materials would be a bad idea, and that it would increase rapes and fights, and "everything sexually related." ECF No. 36-3, at 15. However, the Sheriff's testimony, which appears to rely primarily on common sense, offers no targeted explanation as to the claimed justification for banning a written publication based on the inclusion of one or more advertisements with images, regardless of their size or context, of individuals in a bathing suit, tight shirt, or mini-skirt. In other words, the connection between the VBSO's valid concern about sexually explicit materials entering the facility, and ban on publications with images (particularly thumbnail images) of persons in bathing suits, tight clothing or mini-skirts, was not articulated by Defendants. Moreover, no explanation was offered for the policy's broad ban on photos or writings deemed "offensive." Although the burden to demonstrate that the challenged policy is unconstitutional falls squarely on PLN, Defendants must at least articulate their justification for the broad policy in order for the Court to effectively apply the Turner test and determine whether PLN has carried its burden. Absent some articulation, the Court will not merely assume that a sufficient connection exists to warrant such a broad policy because "common sense" does not suggest such a connection.

prohibition, and the obviousness of its connection to the proffered interest. The showing required will vary depending on how close the court perceives the connection to be."); Aiello, 104 F. Supp. 2d at 1080 (indicating that neither record evidence nor common sense suggests that legitimate prison objectives are advanced by banning "great works of art and literature"); see also Cox v. Denning, No. 12-2571-DJW, 2014 WL 4843951, at *17-18 (D. Kan. 2014) (granting, in part, the plaintiff's cross motion for summary judgment challenging a detention center's incoming mail policies, finding that the defendants had "fail[ed] to present a credible explanation" linking the policy to the stated goal of avoiding the introduction of contraband into the jail, further explaining that "[m]erely accepting Defendants' argument of a rational relationship without any evidence or a logical explanation of why the [challenged] policy advances a particular legitimate penological interest would render the standard toothless, which the Supreme Court has cautioned against." (citing Abbott, 490 U.S. at 414) (emphasis added)).

For all the reasons discussed above, the Court finds that the first Turner factor strongly favors PLN as to both its "facial" challenge and "as applied" challenge to the former VBSO sexually explicit materials policy, as: (1) Defendants have failed to articulate a rational connection between the broad former policy and a valid penological goal; and (2) there is no

obvious rational connection between the broad former policy and valid penological goals such as institutional safety and security.

### b. Alternative Means

The second Turner factor requires the Court to consider whether there are alternative methods for PLN, and VBCC inmates, to exercise their First Amendment rights. Lovelace, 472 F.3d at 200. The constitutional right at issue in this case, defined expansively,[13] appears to include PLN's ability as a publisher to communicate with inmates at VBCC, and the inmates' intertwined right to receive written materials from PLN and other publishers. As discussed below, this factor can be argued to favor either PLN or Defendants, but appears to slightly favor Defendants.

In PLN's favor, the former VBCC policy was so broad as written that it would appear to prohibit every magazine with a single advertisement for Hanes underwear, or other advertisement that included a woman, man, or child in less than full clothing (such as a beach scene), which in an era where some form of "sex symbol" is used to advertise an ever growing number of products,

---

[13] The Supreme Court has cautioned against a narrow interpretation of "the right" in question, finding that it must be "viewed sensibly and expansively." Abbott, 490 U.S. at 417. Accordingly, prison mail restrictions that limit certain publications from entering the prison, yet still "permit a broad range of publications to be sent, received, and read" favor the constitutionality of the challenged restriction. Id. at 418.

such rule, if faithfully applied as written, would appear to cover a substantial percentage of magazines.   See Ginzburg v. United States, 383 U.S. 463, 482 (1966) (Douglas, J., dissenting) (recognizing nearly fifty years ago that using "sex symbols to sell" is an "advertising technique as old as history," and that "[t]he advertisements of our best magazines are chock-full of thighs, ankles, calves, [and] bosoms . . . to draw the potential buyer's attention to lotions, tires, food, liquor, clothing, autos, and even insurance policies").   In contrast, in Defendants' favor, even while such policies were in place, the record suggests that the VBSO permitted "a broad range of publications to be sent, received, and read" at VBCC. Abbott, 490 U.S. at 418.   This element therefore appears to slightly favor Defendants.

### c. Impact of the Desired Accommodation

The third Turner factor requires the Court to consider the likely impact on VBSO staff, inmates, and prison resources if the challenged regulation is struck down.   Lovelace, 472 F.3d at 200.   Here, in light of the Sheriff's voluntary decision to update and improve the VBSO sexually explicit materials policy in advance of a Court ruling on this issue clearly demonstrates that this factor favors PLN.   The new policy still permits the restriction of pornography and other materials that truly qualify as "sexually explicit," but it is far more targeted and

includes    exceptions    for    "patently    medical,    artistic,
anthropological  or  educational  commercial  publications."    ECF
No.  76-2,  at  21.    Plainly,  Defendants  do  not  view  the  new
policy,  which  was  adopted  without  compulsion,  to  constitute  too
great  of  a  drain  on  jail  resources  or  too  great  of  a  risk  to
institutional  security.    Moreover,  "the  desired  accommodation"
sought  by  PLN  is  not  to  force  a  new  policy  on  Defendants,  but  to
preclude  them  from  returning  to  the  prior  overbroad  policy.    As
there  is  no  evidence  suggesting  that  precluding  Defendants  from
returning  to  an  abandoned  policy  would  have  any  negative  impact
on  jail  resources,  the  third  element  of  the  Turner  test  strongly
favors  PLN.

### d. Obvious Alternatives

The  fourth  Turner  factor  requires  the  Court  to  consider
whether  there  are  any  "'obvious,  easy  alternatives'  to  the
challenged  regulation  or  action,  which  may  suggest  that  it  is
'not  reasonable,  but  is  [instead]  an  exaggerated  response  to
prison  concerns.'"    Lovelace,  472  F.3d  at  200  (quoting  Turner,
482  U.S  at  90)  (alteration  in  original).    Stated  differently,
the  Court  considers  whether  an  alternative  regulation,  or  no
regulation  at  all,  "would  fully  accommodate  the  [Plaintiff's]
First  Amendment  rights  at  a  de  minim[i]s  cost  to  legitimate
penological  interests."    Woods  v.  Commissioner  of  the  Ind.  Dept.
of  Corrections,  652  F.3d  745,  750  (7th  Cir.  2011).    For  the  same

reasons discussed immediately above in analyzing the third factor, Defendants' voluntary adoption of a new policy demonstrates that this factor strongly favors PLN.[14]

For all the reasons analyzed herein, most notably, three of the four Turner factors (including the first) strongly favoring PLN, the Court **GRANTS** PLN's motion for summary judgment as to the VBSO's former policy on sexually explicit materials and **DENIES** Defendants' cross motion for summary judgment. However, having previously determined that Defendants are entitled to qualified immunity on such issue, the only relief available to PLN comes in the form of a declaration that the former policy's overbreadth runs afoul of the Constitution, as well as an injunction precluding Defendants from reinstating such former policy.[15]   The Court finds that an injunction precluding

---

[14] As stated on the March 17, 2015 conference call in this case, the Court commends the Sheriff for voluntarily changing the VBSO sexually explicit materials policy and adopting a new policy that appears to fall in the heartland of jail/prison policies that have been upheld by federal courts in the face of constitutional challenges.  Such action speaks volumes to the Sheriff's desire to manage important penological concerns but at the same time respect the guarantees of the United States Constitution.  Although the Sheriff's decision to adopt such modified policy impacts the Turner analysis, it should be noted that even if such action had not been taken, the apparently widespread existence of policies at jails and prisons across the Commonwealth and the country that are far less broad than the VBSO's former policy supports a finding that "obvious alternatives" existed to the former policy.

[15] Although not briefed by the parties, the well-established standard for injunctive relief requires that a plaintiff demonstrate:
   (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that,

Defendants from returning to a specific prior policy that is no longer in force and has been found to be unconstitutional comports with the requirement set forth in 18 U.S.C. § 3626(a) that prospective relief associated with prison conditions be "narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right."

### 3. Former VBSO Publication Review Policies

Currently pending before the Court is PLN's recently-filed motion for summary judgment on the former VBSO publication review policy. This Court previously denied Defendants' summary judgment motion on this same issue, explaining as follows:

> In Montcalm Publ'g, the Fourth Circuit expressly held that a magazine publisher "has a constitutional interest in communicating with its inmate-subscribers" and is therefore entitled to some degree of process when a publication is censored. Montcalm Publ'g, 80 F.3d at 109; see also Jacklovich v. Simmons, 392 F.3d 420, 433 (10th Cir. 2004) (agreeing with the holding in Montcalm Publ'g). Although the Fourth Circuit did not expressly define the precise contours of the process necessary to satisfy the Constitution, it

---

considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. Legend Night Club v. Miller, 637 F.3d 291, 297 (4th Cir. 2011) (quoting eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006)). The Court has considered all of such factors and finds that PLN has carried its burden to demonstrate that injunctive relief is appropriate in this case, as is demonstrated in part by the fact that the "'loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" Id. at 302 (quoting Elrod v. Burns, 427 U.S. 347, 373 (1976) (plurality opinion)).

"h[e]ld that publishers are entitled to notice and an opportunity to be heard when their publications are disapproved for receipt by inmate subscribers," and appeared to discuss with favor a procedure that would provide publishers a written rejection notice and an opportunity to respond in writing. Id. at 106, 109.

Here, it appears undisputed that Defendants first notified PLN of a rejection of an issue of *Prison Legal News* in April of 2012, and did not thereafter notify PLN of subsequent rejections of any PLN publications until late 2013, after the instant lawsuit was filed. Moreover, the record demonstrates that during a period of time in late 2013 when PLN was receiving notice from Defendants of censorship decisions and seeking a review of such decisions, the "review procedure" merely involved a VBSO employee reviewing whether the rejection form was properly filled out; it did not involve a review of the rejected publication to determine whether it actually violated VBSO rules. ECF No. 52-2, at 2-5; see Jordan v. Sosa, 577 F. Supp. 2d 1162, 1172-73 (D. Colo. 2008) (concluding that a BOP program statement was unconstitutional "to the extent it permits the institution to return the [rejected] publication . . . to the publisher prior to completion of the administrative review") (emphasis added).

During the time period relevant to this case, the VBSO has twice amended its policy associated with providing notice and an opportunity to be heard, the first amendment appearing to ensure that "notice" is properly provided, and the second appearing to ensure that a publisher be given the opportunity to be heard as part of a meaningful review procedure. . . .

Accordingly, because the current record, when viewed in PLN's favor, could plainly support a finding that Defendants failed to provide PLN with constitutionally adequate notice, a constitutionally adequate opportunity to be heard, or both, Defendants' summary judgment motion is **DENIED** as to this issue.

ECF No. 65, at 29-32 (footnote omitted).

Subsequent to this Court's decision denying Defendants' motion for summary judgment on this issue, the Court granted PLN's motion for leave to file a second motion seeking partial summary judgment, and allowing PLN to assert, for the first time, that PLN is entitled to judgment as a matter of law on this issue. See ECF No. 74 (granting ECF No. 72). Having fully considered the parties' briefs on PLN's second motion for summary judgment, the Court finds that PLN has demonstrated that the prior VBSO policies infringed on PLN's due process rights as to both "notice" and an "opportunity to be heard."

As to "notice," it is undisputed that Defendants first sent PLN a "Mail Restriction Form" rejecting a single copy of a single issue of Prison Legal News in April of 2012. ECF No. 81-1. Defendants do not dispute the fact that they did not thereafter send another notice of rejection to PLN until October of 2013, although all the monthly issues of Prison Legal News were being censored during this time.[16] The April 19, 2012 form,

---

[16] The Sheriff admits, without providing dates, that one of his mailroom employees, at least for a time, was failing to follow VBSO policy as he was delivering copies of Prison Legal News to inmates. Stolle Aff. ¶ 8, ECF No. 48-3. As suggested in this Court's prior Opinion, if such deliveries were occurring between April 2012 and October of 2013, such fact undercuts Defendants' assertion that PLN was "on notice" that its magazine was being consistently censored. However, even assuming that no "outside of policy" deliveries were made between April 2012 and October of 2013, it is undisputed that Defendants' individualized censorship decisions during this time period were not communicated by Defendants to PLN, as the Sheriff acknowledges that, rather than returning a "seized" mail item to the sender with a notice of rejection, on some occasions prior to the

which contains some handwriting that is difficult to read,
indicates that a single copy of an issue of *Prison Legal News*[17]
was rejected by the VBSO for containing "ordering forms with
prices" and "sexually explicit materials," and that the
publication was "Returned to Sender." Id. Such form indicates
on the bottom that the sender of the rejected mail can
"challenge the seizure of the mailed contraband" and provides a
phone number of the "Property Division" which can be called by
the sender to challenge the seizure. Id. The "Reason/Comments"
section of such form was left entirely blank, and the form does
not otherwise identify the objectionable material, such as by
providing a description or page number. Id.

   Although Defendants assert that summary judgment in PLN's
favor is not appropriate because there are disputed facts as to
whether constitutionally adequate "notice" was provided to PLN
between May of 2012 (immediately after the April 2012 rejection
notice) and October of 2013 (when Defendants began sending
rejection notices to PLN each month), Defendants present no

---

filing of this lawsuit, "the pink copy of the Mail Restriction Form,
designated to the sender, was placed with the seized item in the
inmate's property box awaiting return to the inmate upon release,
rather than being sent to the sender." Id. ¶ 21. The failure to
notify PLN upon non-delivery is further documented in an email
received by PLN from Defendants in August of 2012, which is discussed
in greater detail below. ECF No. 81-2.

[17] Although unclear from the face of the difficult to read form, it is
undisputed that the April 2012 "Mail Restriction Form" rejected an
issue of *Prison Legal News*. ECF Nos. 81, 81-1.

evidence indicating that they notified PLN in May, June, or July of 2012 that the VBSO was continuing to censor issues of *Prison Legal News*. To the contrary, the evidence before the Court indicates that on August 17, 2012, one of the Defendants named in this case informed PLN via email that the practice being followed by the VBSO was to seize issues of *Prison Legal News* and keep them in the inmates' "property box" for an indeterminate amount of time until that inmate was released from VBCC. ECF No. 81-2. In light of the fact that it is undisputed that Defendants were not sending "Mail Restriction Forms" to PLN during this time period, the email corroborates the fact that Defendants were taking no steps between May and August of 2012 to notify PLN either of Defendants' decision to deny delivery to inmate subscribers, but retain in VBCC, the May 2012, June 2012, and July 2012 issues of *Prison Legal News* or the basis for Defendants' individualized decisions to censor such issues. Additionally, because the April 2012 "Mail Restriction Form" did not include any page numbers or other descriptions that specifically identified the allegedly offending material in the banned issue, such form did not provide PLN adequate notice that future issues of its monthly publication would also be barred from the VBCC.

Viewing the facts in Defendants' favor for the purposes of resolving PLN's summary judgment motion, it appears that

communications between Defendants and PLN in mid-August of 2012 retroactively put PLN on notice that monthly issues of *Prison Legal News* had been barred from VBCC the last several months. However, even assuming, without deciding, that the August communications were sufficient to put PLN on notice that the VBSO would continue to ban future issues of *Prison Legal News* if they contained similar content, there is still no evidence that PLN was at that time informed of its right to participate in a review of the past censorship decisions. Therefore, even viewing the facts in Defendants' favor, PLN has demonstrated that Defendants, at least for a short time, failed to satisfy the requirements of Montcalm Publ'g by providing PLN, a publisher, adequate notice that its monthly magazine was being banned during the summer of 2012 and adequate notice of how PLN could challenge such censorship. As noted in this Court's prior order, the fact that PLN may have suspected,[18] or may have

---

[18] PLN admits that "starting in approximately April 2012" it began receiving some items mailed to VBCC inmates "returned to it through the United States Postal Service's 'Return to Sender' process." ECF No. 38 ¶ 15. Even assuming that one or more of the May, June, or July 2012 issues were returned to PLN through such postal process, it is undisputed that Defendants were holding other copies of PLN's magazine in inmate's property boxes during that time period without giving notice to PLN that such magazines were not being delivered. ECF No. 81-2; see ECF No. 48-14. Accordingly, buttressed by the fact that VBCC is a city jail with a transitory population, an item marked "Return to Sender" received subsequent to a single notice that Defendants censored a single copy of a single edition of *Prison Legal News* is insufficient to put PLN on notice either that Defendants made a jail-wide decision to stop delivering all issues of *Prison Legal News* or to inform PLN how it could challenge such decision. On this

actually been aware, that such issues were being rejected based
on communications from inmates to PLN appears largely irrelevant
because "while [an] inmate is free to notify the publisher [of
censorship] and ask for help in challenging the prison
authorities' decision, the publisher's First Amendment right
must not depend on that."[19]   Montcalm Publ'g, 80 F.3d at 109.

---

point, the instant facts are readily distinguishable from the facts of
Van Den Bosch v. Raemisch, No. 09cv62-bbc, 2009 WL 4663134, at *3
(W.D. Wis. Dec. 1, 2009), cited by Defendants, as in that case, no due
process violation was found when the publisher received from the
defendants 35 notices of non-delivery out of approximately 250
copies of a single edition of a newsletter that was sent to prisoners
in Wisconsin state prisons.  Not only did Van Den Bosch involve more
than thirty notices of the rejection of the exact same publication,
but "[m]any of the notices stated explicitly that the decision was a
'DOC WIDE DENIAL.'"  Id. at *4.  In contrast, here, PLN sent different
monthly issues to VBCC inmates between April and August of 2012 and
received from the VBSO only a single rejection notice with respect to
a single copy of a single issue, such notice failing to indicate that
other identical copies of the same issue had been censored, and
failing to indicate that future issues would also be censored.

[19] It appears that, at various times in April of 2012 and thereafter,
some VBCC inmates not only wrote letters to PLN about rejected PLN
mail, but attached copies of the "Mail Restriction Form" the VBSO
provided to that inmate.  ECF No. 48-14.  As noted above, controlling
precedent indicates that such secondary communications from inmates
cannot satisfy Defendants' duty to notify a publisher of a censorship
decision.  Moreover, the copies of the notices before the Court do not
clearly indicate what type of publication was rejected, and even
assuming that those rejection forms that reference "sexually explicit
materials" refer to issues of Prison Legal News, such forms do not
indicate which monthly issue was rejected.  Id.  Although VBCC inmates
supplied PLN with copies of VBSO rejection forms clearly dated in
April and May of 2012 that reference "sexually explicit materials,"
the two forms legibly dated in June of 2012 do not reference a
rejection based on sexually explicit materials, and thus, may refer to
PLN publications other than Prison Legal News.  Id.  Moreover, there
are no forms legibly dated July or August of 2012.  Accordingly, the
secondary presentation of such forms by inmates does not alter the
conclusions reached by the Court herein.

To better illustrate the above finding, the Court turns to a case relied on by Defendants for the proposition that "notice" is not required each and every time a censorship decision is made by jail authorities. Prison Legal News v. Livingston, 683 F.3d 201, 224-25 (5th Cir. 2012). In Livingston, the Fifth Circuit concluded that when a prior decision to exclude a static publication has been finalized (a book was at issue in that case, not a monthly magazine), a prison has no obligation to provide a second "review" process of the identical publication, and thus, the sender has neither a right to notice or a right to be heard on future censorship decisions as to that exact same publication. Id. In rejecting the plaintiff's argument that it was at least entitled to "notice" of a subsequent censorship decision of the static publication even absent the right to a subsequent review process, the Fifth Circuit explained as follows:

> Due process pertains to the right to participate in government decision making. The "notice" required by due process is notice of when, where, and how one can be heard before a decision becomes final. See Londoner v. Denver, 210 U.S. 373, 385 (1908) ("[D]ue process of law requires that . . . [a party] shall have an opportunity to be heard, of which he must have notice . . . ."). The right to receive notice exists only to effectuate the right to be heard, and therefore is inapplicable where a party has no right to participate in the decision-making process.

Id. at 224 (emphasis added).

The facts of the instant case are clearly distinguishable from _Livingston_ because this case involves censorship of discrete issues of a monthly non-static publication, and Defendants have failed to cite any case suggesting that PLN was not entitled to notice and a right to be heard as to each denial. Moreover, there is no evidence in the instant record suggesting that Defendants ever provided PLN with notice of "when, where, and how" they could be heard as to the individualized decisions rejecting PLN's May 2012, June 2012, and July 2012 monthly magazines before such censorship decisions became final.[20]  _Id._  Accordingly, the Court finds that disputed facts need not be resolved in order to determine that, at least for a short time, Defendants failed to provide adequate notice to PLN that its monthly magazine was being censored.

As to an "opportunity to be heard," there is no evidence before the Court suggesting that PLN was ever provided an opportunity to challenge the censorship of its May 2012, June 2012, or July 2012, issues of _Prison Legal News_.  _Cf._ _Prison Legal News v. Cheshire_, No. 1:04cv173, 2006 WL 1868307, at *10 (D. Utah June 30, 2006) (finding that even though a letter sent

---

[20] It appears to be unclear from the record whether the "Mail Restriction Form" dated April 19, 2012 was associated with the April 2012 issue or May 2012 issue of _Prison Legal News_.  However, even assuming that the referenced issue was the May 2012 issue, there is no evidence that Defendants informed PLN that the June and July issues had been rejected prior to the August discussion, which may have retroactively made such announcement, but did not provide any suggestion that such prior decisions were still subject to appeal.

from the defendants to PLN in January of 2005 was arguably "not sent contemporaneously" with the jail's prior rejection of the October, November, and December 2004 issues of *Prison Legal News*, such letter "provided [PLN] with an opportunity to appeal the prior rejections" and thus, PLN "received all the process it was required to receive in this context"). Accordingly, as to those months, PLN has demonstrated both inadequate notice and the associated failure to provide an opportunity to be heard.

Moreover, even if the evidence demonstrated that PLN did receive adequate notice and an adequate opportunity to be heard (which it never invoked) as to the May 2012 through August 2012 timeframe, the record clearly demonstrates that in late 2013, Defendants provided a deficient review process that wholly undercut any meaningfulness of the review of a prior censorship decision, effectively denying PLN the right to be heard. Specifically, in October of 2013, after PLN filed suit, Defendants began providing PLN with notice each month indicating that the monthly issue of *Prison Legal News* had been barred from the VBCC. PLN then began utilizing the review procedure set forth on the notice form, and each time PLN was heard on a censorship decision, the decision to prohibit the challenged issue was upheld. However, it is undisputed that, at least for a period of time, the VBSO was not retaining a copy of the censored *Prison Legal News* publication. Accordingly, the

undisputed facts demonstrate that the VBSO "review" procedure was not a review to see if the censored content actually violated VBSO policies, but was instead merely a review to make sure that the VBSO "Mail Restriction Form" was properly filled out. Stated differently, the entire review process consisted of a second set of eyes reviewing a copy of the "Mail Restriction Form" to see if the person who had completed such form claimed that there was a basis for censorship. It is readily apparent that such review procedure deprived PLN of a meaningful opportunity to be heard. See Jordan, 577 F. Supp. 2d at 1172-73 (awarding declaratory and injunctive relief in the plaintiff's favor based on the finding that the disputed BOP "Program Statement" was unconstitutional "to the extent it permits the institution to return the publication rejected [for containing nudity] . . . to the publisher prior to completion of the administrative review") (emphasis added).

Similar to the VBSO's sexually explicit materials policy, the apparent infirmities with the VBSO publication review policy that came to light during the pendency of this case were swiftly rectified by the Sheriff, and he should be commended for his actions of twice amending the VBSO notice and review procedure. The first modification appears to have been aimed at ensuring that VBSO employees were consistently providing notice to publishers of rejected publications, and the second modification

appears to have been aimed at ensuring that censored materials are retained for a sufficient period of time to permit a meaningful review process.[21]    That said, the question currently before this Court is whether the Defendants' prior policies and practices violated the Constitution, and based on the controlling standard articulated by the Fourth Circuit holding that publishers are entitled to both "notice and an opportunity to be heard when their publications are disapproved for receipt by inmate subscribers," Montcalm Publ'g, 80 F.3d at 106, and as illustrated best by the well-reasoned and squarely on-point opinion from the Colorado District Court in Jordan, 577 F. Supp. 2d at 1172-73, this Court finds that PLN has demonstrated that a due process violation occurred when PLN was denied a meaningful opportunity to be heard for a period of several months beginning in October of 2013.

---

[21] According to the Sheriff's affidavit, the first amendment occurred in September of 2013 and involved the revision of an internal directive to ensure that the "pink copy of the [VBSO] Mail Restriction Form would be sent to the sender" of the censored publication.    ECF No. 48-3 ¶ 22.    Subsequently, in April of 2014, a "VBSO Policy and Procedure General Order" was modified in order to clarify that "seized mail items are to be retained for 30 days to allow for their review in the event of a challenge to the seizure."    Id. ¶ 25; see id. ¶ 24 (setting forth the language of the current policy which provides: (1) notice to both the sender and the inmate; (2) the reason for the seizure will be offered; (3) a 30 day appeal period will follow during which both "[t]he inmate and sender are allowed the opportunity to challenge the seizure"; (4) the review of a seizure will be provided by an individual that did not make the initial decision and who has authority to overturn such decision; and (5) that after the review period, the seized item will be stored, returned to sender, or destroyed).

Although the Sheriff has long-since implemented a corrected policy that on its face provides adequate notice and an opportunity to be heard, the declaratory and injunctive relief requested by PLN on this issue remains a live controversy in light of Defendants' failure to acknowledge that either version of their prior policy/practices was unconstitutional, or even constitutionally suspect. See Wall, 741 F.3d at 497 (noting that the "heavy burden" of demonstrating that "the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness," and that "when a defendant retains the authority and capacity to repeat an alleged harm, a plaintiff's claims should not be dismissed as moot") (internal citations omitted). Because the Sheriff retains the ability to change the VBSO policy on this issue at any time, and he has not submitted an affidavit recognizing any impediment to returning to either of the former policies/practices, the Court hereby **GRANTS** PLN's second motion for summary judgment. In so ruling, the Court grants PLN's request for a judgment declaring that PLN's due process rights were violated during a period of months in the middle of 2012, and violated in a different way for a period of months beginning in October of 2013. The Court likewise grants PLN's request for injunctive relief, and the Sheriff is hereby **ENJOINED** from returning to the prior policies/practices that failed to provide publishers adequate

notice or an opportunity to be heard "when their publications [were] disapproved for receipt by inmate subscribers." Montcalm Publ'g, 80 F.3d at 106.[22]   In compliance with 18 U.S.C. § 3626(a), requiring that prospective relief ordered in any civil action associated with prison conditions be "the least intrusive means necessary to correct the violation of the Federal right," this Court declines to issue an injunction including language similar to that requested in the Amended Complaint as doing so appears more intrusive than necessary because it would improperly interfere with the Sheriff's ability to maintain appropriate policies and procedures at VBCC.[23]

### IV. Monetary Damages

#### A. Initial Summary Judgment Motion

Monetary damages are not available to PLN as to the sexually explicit materials policy based on this Court's prior ruling that Defendants were qualifiedly immune for money damages

---

[22] As in the previous section of this Opinion analyzing the former VBSO sexually explicit materials policy, the Court finds that PLN has carried its burden to demonstrate that an injunction is proper under the four-part test articulated by the Supreme Court in eBay, 547 U.S. at 391.

[23]   The Amended Complaint requests an injunction requiring that rejection notices specifically identify both the page numbers of objectionable material as well as the penological justification claimed to be threatened by such material.   ECF No. 17.   PLN, however, failed to demonstrate that when it did receive notice of censorship decisions from Defendants, such notice lacked sufficient particularity to allow for a meaningful right to be heard as to that specific rejection decision.   Absent such showing, a broader injunction is not appropriate.   Moreover, it is notable that Defendants at some point began specifically identifying the objectionable material, clearly a better practice regardless of whether it is constitutionally required.

on this issue. ECF No. 65, at 33-42. Accordingly, there are no outstanding issues as to damages with respect to such motion.

### B. PLN's Second Summary Judgment Motion

As to PLN's due process claim, PLN asserts that it is entitled to "nominal damages" and "punitive damages" in the event that summary judgment is granted in PLN's favor as to its second motion for partial summary judgment. ECF No. 83, at 3 n.1. It appears from Defendants' post conference call informal status update to the Court that Defendants' position is that PLN is entitled to no more than one dollar in nominal damages, and is not entitled to punitive damages based on the absence of evidentiary support.

As the parties have requested the opportunity to reach agreement on damages in the event that summary judgment was granted in favor of PLN on its due process claim, the parties are hereby afforded **fourteen (14) additional days** to confer on this issue. If the parties have not reached an agreement by the end of the **fourteen (14) day period**, they shall, separately or collectively, file a "Status Update" on the record.

### V. Conclusion

For the reasons set forth in detail above, PLN's original motion for summary judgment is **GRANTED** as to the reserved issue regarding the constitutionality of Defendants' former policy on sexually explicit materials. ECF No. 35. Such former policy is

declared unconstitutional as it is overbroad pursuant to the Turner analysis discussed in detail herein. The Sheriff and other named Defendants are hereby permanently **ENJOINED** from reverting to such policy. Defendants' cross motion for summary judgment on this issue is **DENIED**. ECF No. 49.

PLN's second motion for summary judgment is **GRANTED**, and it is hereby declared that Defendants' former publication review policies were unconstitutional as they failed to provide adequate notice and an opportunity to be heard as to decisions made by the VBSO to censor a unique monthly publication sent to inmate subscribers. ECF No. 77. Such ruling is based both on the finding that PLN demonstrated that it was denied due process during a period of months in the middle of 2012, and violated in a different way for a period of months beginning in October of 2013. The Court likewise grants PLN's request for injunctive relief, and the Sheriff and other named Defendants are hereby permanently **ENJOINED** from reverting to the prior policies that failed to provide publishers adequate notice and an opportunity to be heard "when their publications [we]re disapproved for receipt by inmate subscribers." Montcalm Publ'g, 80 F.3d at 106.

As indicated above, at the parties' request, the parties are hereby afforded **fourteen (14) additional days** to confer on the issue of monetary damages, and the Court strongly encourages

the parties to meet in person if they are having difficulty reaching an agreement. Should the parties desire to schedule a continuation of settlement discussions with a Magistrate Judge of this Court, they should not hesitate to contact the deputy clerk responsible for scheduling matters with the Magistrate Judge that previously handled settlement discussions in this case. If the parties have not reached an agreement by the end of the **fourteen (14) day period**, they shall, separately or collectively, file a "Status Update" on the record including comments on whether a continuance of the settlement conference has been scheduled and, if not, whether PLN wishes to proceed to a jury trial on the issue of nominal and/or punitive damages.

The Clerk is **REQUESTED** to send a copy of this Opinion and Order to all counsel of record.

**IT IS SO ORDERED.**

/s/ Mark S. Davis
Mark S. Davis
United States District Judge

Norfolk, Virginia
March 31 , 2015